584 A.2d 888

**Nancy F. MITZELFELT and Lewis Mitzelfelt, Appellants,**

**v.**

**Robert KAMRIN, M.D., Earle Andre Wootton, Co-executor of the Estate of Robert S. Andre, M.D., Deceased, Fidelity Bank, Co-executor of the estate of Robert S. Andre, M.D., Deceased, Neurosurgical Associates, and Riddle Memorial Hospital, Appellees.**

Supreme Court of Pennsylvania.

Argued April 6, 1990.

Decided Dec. 27, 1990.

56

James E. Beasley, Barbara R. Axelrod, for appellants.

Barton L. Post, William F. Sullivan, Jr., for appellees.

Before NIX, C.J., and LARSEN, FLAHERTY, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## OPINION OF THE COURT

CAPPY, Justice:

The issue before this court is what standard of proof is required in medical malpractice cases when there is a percentage of risk that that harm would occur, even in the absence of negligence. Although we believe that this issue has been adequately addressed in the case of *Hamil v. Bashline*, 481 Pa. 256, 392 A.2d 1280 (1978), and its progeny, we again write to dispel any possible confusion.

## PROCEDURAL HISTORY

This lawsuit was filed by Nancy F. Mitzelfelt and Lewis Mitzelfelt (hereinafter "appellants") against the named defendants and another physician, Dr. Robert Kamrin (hereinafter "Kamrin"). Riddle Memorial Hospital (hereinafter "Riddle") filed a cross claim against Kamrin and the estate of Dr. Andre (hereinafter "Andre"). On the first day of trial, appellants settled with Kamrin and Andre (the surgeons) and Neurological Associates (a partnership consisting of Kamrin and Andre) and provided them with a joint tortfeasor release. The appellants proceeded against Riddle on a theory that the hospital was responsible for the acts of their employees and on a theory of vicarious liability for the acts of an anesthesiologist, Dr. Villasis. The appellants presented no evidence against Kamrin, Andre and

Neurological Associates, and the trial court granted their motion for a directed verdict in their favor.

Following submission of the case as against the remaining defendants (appellees) to the jury, a verdict was rendered in favor of the appellants in the amount of $3,000,000 against Riddle, which award was subsequently molded to reflect delay damages. Post trial motions were filed by Riddle and denied by the trial court.

An appeal was filed by Riddle and the Superior Court reversed the decision of the trial court, finding that the Mitzelfelts had failed to present a *prima facie* case of medical malpractice.

## FACTUAL HISTORY

In August, 1981 the Appellant, Nancy Mitzelfelt was admitted to Riddle Memorial Hospital in response to progressive difficulty with gait, spasms of the upper and lower extremities, and urgency of urination. A cervical laminectomy was performed. Immediately after the surgical procedure, Mrs. Mitzelfelt developed partial paralysis of all four extremities, known as quadriparesis. She is now substantially confined to a wheelchair and is unable to care for herself. Among the other medical difficulties from which she suffers are the inability to control her bowel and bladder functions, spasticity in her arms and legs, and constant pain in her extremities. Her husband is required to care for her most basic needs.

During pretrial discovery, Dr. Lawrence F. Marshall, a California neurosurgeon who had been retained by the Mitzelfelts, stated in a report that the degree of neck flexion during the surgery was "probably the most logical explanation for the quadraparesis." Dr. Marshall stated in his report that he found "no evidence of any kind of major change in the blood pressure or heart rate which would be consistent with some sudden untoward event during the procedure." Thirteen days before trial, the defendant surgeons submitted the expert report of Henry Shenkin, M.D.

In that report, Dr. Shenkin stated that he did not believe that the medical records indicated that there was neck flexion during the surgery. His report also indicated that he "disagree[d] with Dr. Marshall that there is no evidence of any kind of major change in the blood pressure or heart rate which would be consistent with some sudden untoward event during the procedure." Dr. Shenkin went on to state that assuming there was a substantial drop in blood pressure, it was sufficient to compromise the blood supply to the spinal cord. Dr. Shenkin stated that he was not certain whether there was a substantial drop in blood pressure because he had trouble reading the anesthesia record.

Once the surgeons had agreed to settle their portion of the case, the Mitzelfelts proceeded against the hospital. Counsel for the Mitzelfelts did not call as a witness Dr. Marshall, the expert they had retained. Rather, they called Dr. Shenkin, the expert for the surgeons, as a witness. Dr. Shenkin's theory of liability was directed at the acts of the anesthesiologists and the attending hospital staff.

During trial, the appellants called as a witness, Marlene McGrath, a nurse-anesthetist who had been one of the operating room staff responsible for Mrs. Mitzelfelt's anesthesiology. During her deposition prior to trial, Mrs. McGrath had testified that Appellant's blood pressure upon arrival in the operating room was 124/78 (systolic/diastolic). She testified that it would have been negligence to allow the systolic pressure to drop thirty points (which would be 94). There was testimony (from three different witnesses) during the trial that Mrs. Mitzelfelt's systolic pressure fell either to 80, 85, or 88.

During her testimony at trial, Mrs. McGrath testified in a manner inconsistent with her deposition testimony. She stated that the blood pressure reading of 124/78 should have been discounted, and the controlling blood pressure was that taken on the hospital floor before going to the operating room; 110/70. According to her trial testimony, Mrs. Mitzelfelt's systolic pressure should not have been allowed to fall to 80. Dr. Smith, the expert for the hospital,

stated in his report that her systolic pressure had fallen to 80, although his trial testimony was that he did not know how he arrived at that figure and was concerned that it was from misreading a poor reproduction of the medical records. The appellants did not call Dr. Marshall as an expert witness at trial, but rather called Dr. Shenkin, the expert witness originally retained by the defendant surgeons, who had settled prior to trial. During direct examination, he testified as follows:

Q. What would happen to the patient if there was a compromise to the blood supply to the cervical spinal cord in the area of C-4, 5-6 and 6-7?

A. If it were compromised sufficiently long, it would interfere with the function of the spinal cord in that area.

Q. Is there a condition that would be diagnosable as a result of that?

A. The patient would have to have loss of power in his extremities.

Q. Would that be called a quadriplegia?

A. In some instances, that would be complete loss of power.

Q. That would be a complete paralysis, as we lay people know it?

A. Yes, it would be complete. If it were partial, it would be quadriparesis.

Later, Shenkin testified on direct examination:

Q. Was it your opinion, and I assume any opinion you express is based on your reasonable evaluation as a physician, isn't that true?

A. yes, sir.

Q. And your opinion that this drop in blood pressure is sufficient to compromise the blood pressure supply to the spinal cord of this particular patient in the upright position and under general anesthesia. You said that opinion in this letter, did you not?

A. Yes, sir.

Additionally, Shenkin testified that although the majority of patients do better, approximately 20 percent of patients will be weaker after the operation; a fact agreed with by Dr. Smith, the hospital's expert. On cross examination, Dr. Shenkin testified as follows:

Q. Doctor I asked you to advise everybody in this courtroom whether the type of injury that Mrs. Mitzelfelt suffered after this operation on August 7, 1981, is or is not necessarily a result of negligence or malpractice?

A. Not necessarily is the answer. *Nobody can be sure.* Twenty percent of these patients do badly, no matter what you do. (emphasis supplied).

\* \* \* \* \* \*

Q. The bottom line is, do you know within a reasonable degree of medical certainty, can you tell the ladies and gentlemen of this jury within a reasonable degree of medical certainty that this drop in that blood pressure, that one reading to something between 85 and 90 millimeters of mercury caused the problem that Mrs. Mitzelfelt has?

A. No. It is my opinion that it could have, but I wouldn't put it as a reasonable degree of medical certainty.

## DISCUSSION

In reviewing this case, we are mindful that our standard of review is a limited one.

Appellant, as the verdict winner, is entitled to have her evidence viewed on appeal in the light most favorable to her; she must be given the benefit of every fact and every reasonable inference of fact arising therefrom, and any conflict in the evidence must be resolved in her favor. *Jones v. Three Rivers Management Corp.*, 483 Pa. 75, 88, 394 A.2d 546, 553 (1978).

Furthermore, "[o]ur system vests the responsibility of determining the facts with the jury and we will not upset their findings absent a showing that the verdict is capricious,

against the weight of the evidence and resulted in a miscarriage of justice." *Gajkowski v. International Brotherhood of Teamsters*, 515 Pa. 516, 531, 530 A.2d 853, 861 (1987), *cert. denied*, 490 U.S. 1022, 109 S.Ct. 1748, 104 L.Ed.2d 185 (1989). Keeping these principles firmly in mind, we turn to the facts of this case.

■ In order to establish a *prima facie* case of malpractice, the plaintiff must establish (1) a duty owed by the physician to the patient (2) a breach of duty from the physician to the patient (3) that the breach of duty was the proximate cause of, or a substantial factor in, bringing about the harm suffered by the patient, and (4) damages suffered by the patient that were a direct result of that harm. *See, Morena v. South Hills Health System*, 501 Pa. 634, 462 A.2d 680 (1983); Prosser, *Law of Torts*, Section 30 at 143 (4th ed. 1971).

■ A plaintiff is also required to present an expert witness who will testify, to a reasonable degree of medical certainty, that the acts of the physician deviated from good and acceptable medical standards, and that such deviation was the proximate cause of the harm suffered. *Brannan v. Lakenau Hospital*, 490 Pa. 588, 417 A.2d 196 (1980). In many cases, this is not a problem for a plaintiff. However, certain cases make this an impossible standard. These are the cases in which, irrespective of the quality of the medical treatment, a certain percentage of patients will suffer harm.

■ An example of this type of case is a failure of a physician to timely diagnose breast cancer. Although timely detection of breast cancer may well reduce the likelihood that the patient will have a terminal result, even with timely detection and optimal treatment, a certain percentage of patients unfortunately will succumb to the disease. This statistical factor, however, does not preclude a plaintiff from prevailing in a lawsuit. Rather, once there is testimony that there was a failure to detect the cancer in a timely fashion, and such failure increased the risk that the woman

would have either a shortened life expectancy or suffered harm, then it is a question for the jury whether they believe, by a preponderance of the evidence, that the acts or omissions of the physician were a substantial factor in bringing about the harm. See, *Jones v. Montefiore Hospital*, 494 Pa. 410, 431 A.2d 920 (1981).[1]

The hospital here claims that a directed verdict should have been granted in its favor, as Dr. Shenkin was unable to state, with a reasonable degree of medical certainty, that the plaintiff's injuries were caused by the negligence of the anesthesiologist.

We find the case law as set forth in *Hamil v. Bashline*, 481 Pa. 256, 392 A.2d 1280 (1978); *Gradel v. Inouye*, 491 Pa. 534, 421 A.2d 674 (1980); and *Jones v. Montefiore Hospital*, 494 Pa. 410, 431 A.2d 920 (1981) to be controlling in the instant case.

In those cases, this court discussed what constitutes sufficient evidence to create a *prima facie* case of causation in a medical malpractice case in which there was a possibility that the harm would have occurred, even in the absence of negligence. In *Hamil v. Bashline, supra,* we said "[o]nce a plaintiff has introduced evidence that a defendant's negligent act or omission increased the risk of

---

1. Legal commentators have noted this different standard in cases where there is a statistical uncertainty:

    It is often difficult for a patient-plaintiff to demonstrate that a physician's negligence was a substantial factor in causing injury, because a patient-plaintiff cannot prove the events which would have occurred, had the physician not acted negligently. If the the physician proves that the injury would have been sustained without his or her negligence, then the physician is not liable for the injury.

    Since the burden is on the patient-plaintiff, however, this standard often treated patient-plaintiff unfairly. Accordingly, the Pennsylvania Supreme Court has held that once a patient-plaintiff shows that a physician-defendant's negligence increased the risk of harm and that harm actually occurred, sufficient evidence has been offered to submit the case to a jury. The jury must then decide whether the increased risk constituted a substantial factor contributing to the injuries sustained. Post, Peters and Stahl, *The Law of Medical Practice in Pennsylvania and New Jersey,* section 4:35, at page 416 (1984), citing to *Hamil v. Bashline,* 481 Pa. 256, 392 A.2d 1280 (1978).

64

harm to a person in the plaintiff's position, and that the harm was in fact sustained, it becomes a question for the jury as to whether or not that increased risk was a substantial factor in producing the harm." *Id.* 481 Pa. at 269, 392 A.2d at 1286.

*Bashline* also held that "[i]n establishing a *prima facie* case, the plaintiff need not exclude every possible explanation of the accident; it is enough that reasonable minds are able to conclude that the preponderance of the evidence shows defendant's conduct to have been a substantial cause of the harm to plaintiff." *Id.* 481 Pa. at 266, 392 A.2d at 1285.

█ The question presented in this case is whether the appellants introduced evidence that the acts of the appellees *increased the risk of harm* to the appellant. Our review of the facts leads us to the conclusion that there were sufficient facts from which the jury could have determined that it did.

Dr. Shenkin testified that the compromise in blood pressure was sufficient to cause paraparesis. Mrs. McGrath testified during her deposition that there was a thirty point drop in blood pressure. Dr. Shenkin testified that in twenty percent of these cases, the patient will be weaker following surgery, irrespective of the treatment. As he stated during cross examination, *no* physician could testify to a reasonable degree of medical certainty that the harm was caused by malpractice. The most that could be said was that the drop in blood pressure increased the likelihood that harm would have resulted.

The factual scenario in *Bashline* is analogous and instructive to the instant matter. In *Bashline*, the plaintiff was brought to the hospital, suffering from chest pains. An electrocardiogram ("EKG") was ordered, but due to a faulty electrical outlet, the EKG could not be performed. A second EKG was ordered by the treating physician, who, after ordering the EKG, left the hospital. A second EKG machine could not be found, and upon receiving no further

help, Mrs. Hamil transported her husband to the private office of a Dr. Saloom, whereupon Mr. Hamil died while an EKG was being performed.

The expert witness for the plaintiff testified that had Mr. Hamil been treated properly, he would have had a 75% chance of surviving the attack. The expert also testified that this substantial chance of recovery was terminated by defendant's failure to provide prompt treatment. Defendant's expert testified that Mr. Hamil would have died irrespective of the treatment rendered. However, because the plaintiff's expert could only state that there was a 75% chance that Mr. Hamil would have survived, the trial court determined that his testimony failed to establish, with the required degree of medical certainty, that the alleged negligence of the defendant was the proximate cause of the harm, and directed a verdict in favor of the defendant. For the reasons stated above, this court disagreed.

The scenario of the case *sub judice* is similar to that in *Bashline*. The expert called by the appellants testified that an uncorrected drop in blood pressure of 30 points could have compromised the blood flow to the spinal cord and that a compromise in the blood flow to the spinal cord causes paraparesis or paraplegia. He also testified that weakness in the extremities can result in twenty percent of cases. Furthermore, there was testimony from the surgical nurse that she would have taken preventive measures if the systolic pressure had dropped 30 points. Using her deposition testimony, this would mean that the systolic pressure would have had to have been 30 points less than 124; or 94. Using her testimony from trial, this would have meant that the systolic pressure would have had to drop 30 points from 110; or 80. As is well accepted, prior inconsistent statements may be used as substantive evidence to prove the truth of the matters asserted therein, as long as the witness is a party, or a non-party and is available to testify. *Commonwealth v. Brady*, 510 Pa. 123, 507 A.2d 66 (1986); *O'Donnell v. Westinghouse Elec. Comp.*, 515 Pa. 307, 528

A.2d 576 (1987). As such, the jury was free to believe her deposition, rather than her trial, testimony.

■ Dr. Smith, the expert called by Riddle, stated in his report, that the systolic pressure got as low as 80 at one point during the surgery. During trial, he testified that his opinion may have been based on a misreading of a poor reproduction of a medical record. However, the jury could believe any part of the witnesses' testimony that they chose and disregard any portion of the testimony that they disbelieved. See, e.g. *Commonwealth v. Whitfield,* 475 Pa. 297, 380 A.2d 362 (1977).

In *Gradel v. Inouye, supra,* a physician failed to diagnose timely fibrosarcoma (bone cancer) in the arm of a boy whom he had treated following a fracture of the arm. The doctor diagnosed the lump that appeared at the fracture site as a callous formation. Despite treatment, the arm of the child had to be amputated. In discussing the standard of proof required, this court cited section 323 of the Restatement of Torts (Second) as being applicable to the case, stating, "[w]hen applicable, as it clearly is here, Section 323(a) relaxes the degree of certainty ordinarily required of a plaintiff's evidence to provide a basis upon which the jury may find causation." 491 Pa. at 542, 421 A.2d at 687.[2]

The expert who testified on behalf of the Mitzelfelts did not use the words "increased the risk of harm" in his opinion. However, when his testimony is taken as a whole, it clearly met that standard. Reviewing the evidence in the light most favorable to the verdict winner and "giving the benefit of every fact and every reasonable inference of fact" to the appellant, we believe that the appellant met the

**2.** Section 323 of the Restatement (Second) provides: Sec. 323. *Negligent Performance of Undertaking to Render Services-* One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of harm, or
(b) the harm is suffered because of the other's reliance upon the undertaking.

burden required. *Jones, supra.* We do not require experts to use "the magic words" when testifying. Rather, we look to the substance of their testimony to determine whether it meets the standard required. "Section 323(a) was designed to *relax* a plaintiff's burden of proving causation, not to compound it." *Jones v. Montefiore Hospital, supra,* 494 Pa. at 418, 431 A.2d at 924 (emphasis in original).

■ In analyzing this case under the *Bashline* standard, we employ a two part test. The first step is to determine whether the expert witness for the appellants could testify to a reasonable degree of medical certainty that the acts or omissions complained of could cause the type of harm that the appellant suffered. In this case, Dr. Shenkin testified that a thirty point drop in blood pressure was significant enough to compromise the blood pressure to the spinal cord. Further, a compromise of the blood pressure to the spinal cord can cause paraparesis. As such, Dr. Shenkin's testimony rose to the level required by the first prong of the analysis.

The second step is to determine whether the acts complained of caused the actual harm suffered by the appellant. This is where we apply the relaxed standard. As the experts all testified, twenty percent of patients do poorly after this surgery. As such, it would have been impossible for any physician to state with a reasonable degree of medical certainty that the negligence actually caused the condition from which Mrs. Mitzelfelt suffered. The most any physician could say was that he believed, to a reasonable degree of medical certainty that it *could have* caused the harm. Once Dr. Shenkin rendered this opinion, it then became a question for the jury whether they believed it caused the harm in this case.

The trial court correctly instructed the jury that the plaintiff must prove that the acts of the defendant were a substantial factor in bringing about the harm and that "[a] causal connection between the injuries suffered and the defendant's failure to exercise reasonable care may be

proved by evidence if the risk of those injuries was increased by the defendant's negligent conduct."

The expert physician testified that the drop in blood pressure could have caused the harm and thus, it became a function of the jury to decide if it actually did.

A defendant cannot escape liability because there was a statistical possibility that the harm could have resulted without negligence. "The fact that some other cause concurs with the negligence of the defendant in producing an injury does not relieve the defendant from liability unless he can show that such other cause would have produced the injury independently of his negligence." *Majors v. Brodhead Hotel*, 416 Pa. 265, 273, 205 A.2d 873, 878 (1965). Once there is sufficient testimony to establish that (1) the physician failed to exercise reasonable care, that (2) such failure increased the risk of physical harm to the plaintiff, and (3) such harm did in fact occur, then it is a question properly left to the jury to decide whether the acts or omissions were the proximate cause of the injury. *See Bashline, supra,* 481 Pa. at 262, 392 A.2d at 1286; *Gradel v. Inouye,* 491 Pa. at 541, 421 A.2d at 677. "The jury, not the medical expert, then has the duty to balance probabilities and decide whether defendant's negligence was a substantial factor in bringing about the harm." *Bashline, supra,* 481 Pa. at 273, 392 A.2d at 1288–89; *Gradel,* 491 Pa. at 544, 421 A.2d at 679.

We are not establishing a new principle of law in this case. We are merely re-emphasizing a well established principle that has existed since the *Bashline* case.

We find that in reviewing the facts in the light most favorable to the verdict winner, the appellants introduced sufficient evidence to establish a *prima facie* case that (1) the standard of care deviated from good and acceptable medical practice, (2) that such deviation increased the risk of harm to the patient, and (3) that such harm was actually suffered.

Finally, we note that the Superior Court did not address all the issues raised by Riddle in its appeal. The Superior court reasoned that since the Mitzelfelts failed to present a *prima facie* case, the court was not required to reach those issues.

Accordingly, we reverse the decision of the Superior Court and remand this case to them to decide the issues raised by Riddle that were not addressed in the prior decision.

ZAPPALA, J., concurs in the result.

McDERMOTT, J., did not participate in the consideration or decision of this matter.