687 A.2d 830

**Mary C. KRATT, as Administratrix of the Estate of Albert Kratt, Deceased, and in her own right, Appellee,**

v.

**Jan C. HORROW, M.D., Terry Heiman–Patterson, M.D., J., March Maquilan, M.D., and Hahnemann University Hospital.**

**Appeal of J. March MAQUILAN, M.D.**

Superior Court of Pennsylvania.

Argued Sept. 18, 1996.

Filed Dec. 10, 1996.

Reargument Denied Feb. 11, 1997.

Francis J. McGovern, Blue Bell, for appellant.

Michael J. D'Aniello, Norristown, for Kratt, appellee.

Before DEL SOLE, BECK and POPOVICH, JJ.

POPOVICH, Judge.

We affirm the order of the Court of Common Pleas of Philadelphia County removing a compulsory nonsuit entered in favor of the defendant/appellant, J. March Maquilan, M.D.

A motion for compulsory nonsuit allows a defendant to test the sufficiency of a plaintiff's evidence. *Francioni v. Gibsonia Truck Corp.*, 472 Pa. 362, 372 A.2d 736 (1977). A compulsory nonsuit can only be granted in cases where it is clear that a cause of action has not been established and the plaintiff must be given the benefit of all favorable evidence along with all reasonable inferences of fact arising from that evidence, resolving any conflict in the evidence in favor of the plaintiff. *Coatesville Contractors v. Borough of Ridley*, 509 Pa. 553, 506 A.2d 862 (1986).

Additionally, our Supreme Court has enforced strictly the rule that a nonsuit may not be granted where a defendant has offered evidence either during or after the plaintiff's case. See, e.g., *Highland Tank & Manufacturing Co. v. Duerr*, 423 Pa. 487, 225 A.2d 83 (1966); *Atlantic Richfield Co. v. Razumic*, 480 Pa. 366, 390 A.2d 736 (1978). Here, the defendant

offered a defense expert (Dr. Jamieson) after the plaintiff's case-in-chief but before entering a compulsory nonsuit.

█ The express language of Pa.R.Civ.P. 230.1 and the above cited authorities compel us to conclude that the trial court was not empowered to enter the initial nonsuit because the appellant had offered evidence. Nonetheless, even though it was procedurally improper for the trial court to enter a nonsuit, we find that as a matter of law the error was harmless. We reach this determination upon a review of the evidence which discloses that the trial court did not take Dr. Jamieson's testimony into consideration in disposing of the nonsuit motion. See Reproduced Record 378a (Trial court stated specifically that it would not weigh the defendant's expert's testimony in ruling upon the motion for nonsuit). See, e.g., *Storm v. Golden*, 371 Pa.Super. 368, 538 A.2d 61, 63 (1988) (Citing cases).

Moreover, the appellant asked the court's permission to allow Dr. Jamieson's testimony to accommodate her work schedule without waiving his right to seek a compulsory nonsuit, which the trial court granted without objection by the plaintiff. See Reproduced Record 284a. We, therefore, reject the plaintiff's claim that the trial court acted improperly. See *Eisenhauer v. Clock Towers Associates*, 399 Pa.Super. 238, 582 A.2d 33, 38 (1990) (Trial court did not act improperly in considering release in granting a nonsuit, where it was accomplished without the plaintiffs' objection and the plaintiffs had testified about the material during direct examination); see also *Commonwealth v. Brown*, 328 Pa.Super. 215, 476 A.2d 969, 971 (1984) ("In light of trial court's express statement that it looked exclusively to the evidence 'without any reference to any other question' dealing with appellant's arrest record in rendering its verdicts, appellant's claim [of trial court error] cannot prevail." (Citation omitted)).

█ More specifically, it can be gleaned from the record as follows: On Christmas Eve of 1985, the 77–year–old Albert Kratt was admitted to the hospital complaining of chest pains (diagnosed as a heart attack). A catherization showed that

the plaintiff had severe blockage. A triple bypass was the considered judgment of the attending physician (J. March Maquilan) and the plaintiff's regular physician. The two advised the plaintiff to undergo an operation, labelled "urgent", because of his continuing angina.

On December 29, 1985, Dr. Maquilan met with the patient at 8:00 p.m. and advised him of the risks associated with the medical procedure. The patient signed the consent form December 30th, with surgery scheduled the next day. Prior to surgery, the defendant was advised that the plaintiff had fallen and sustained a cut to his forehead. The defendant requested a neurologic clearance before he would perform surgery.[1]

Although the defendant did not recall speaking directly with the neurologist about the consultation, he did "receive clearance" that the plaintiff did not sustain a subdural hematoma.[2] During surgery, atrial arrhythmia (caused by manipulating the right atrial appendage of the heart) lasted two or three seconds. After surgery, the plaintiff appeared agitated, confused, disoriented and not following commands. See Plaintiff's Exhibits P7 & P8. It was not until the ninth day after surgery that a second CAT scan was performed and compared to an earlier x-ray, both of which showed "areas of abnormal

1. The coronary care unit resident (Dr. Mark Johnson) saw the plaintiff after the fall and sutured his cut. Drs. Patterson and Schaffer conducted the neurologic exam of the plaintiff, which discounted the presence of a subdural hematoma.

   Also, a physical examination of the plaintiff was uneventful save for one of his toes pointing up (Babinski response), which the plaintiff's expert (Dr. Axelrod) interpreted as an "equivocal Babinski reflex o[f] the left foot" not definitively negative or definitively positive, but somewhere in between. See Reproduced Record 442a.

2. The defendant was in surgery when he received notice of the plaintiff's 7:00 a.m. fall. Before the operation was completed, however, the defendant was informed by his resident assistant that the plaintiff had been "cleared". Reproduced Record 254a. Moreover, Dr. Patterson did not recall being asked to "clear" the plaintiff for surgery, but merely whether he had sustained a subdural hematoma as a result of the fall. She found no such evidence of a cerebral insult and so noted it in her report.

low density ... mainly in the periventricular white matter." See Plaintiff's Exhibit P–11.

Since 1985, the number, size and delineation of the white matter abnormalities increased. New infarctions at the tips of both occipital lobes showed areas of abnormally low density. And, the recent CAT scan showed cerebral hypoxia (lack of oxygen to the brain) and hypoperfusion (diminished blood circulation) during surgery. Stated otherwise, the plaintiff's expert (Dr. Axelrod) remarked that the precipitous drop in blood pressure and sudden irregularity of the heart rhythm "could" account for the cerebral hypoxia or hypoperfusion.

The plaintiff never regained consciousness, and the expert opined that "possibly" the fall before the surgery may have increased the victim's operative risks: the "possibility" of a TIA (Transient Ischemic Attack) put the patient at a higher risk of suffering an intraoperative event. The plaintiff's expert went on to opine what may have occurred preoperatively and after the consent form was executed: At 7:00 a.m., December 31st something happened—concussion or a TIA to the brain. With either event, the plaintiff's risk of surgery increased and it was necessary for the attending physician to secure additional consent from the victim before operating.

Initially, the trial court agreed with the defendant that the plaintiff failed to establish facts sufficient to sustain a cause of action for medical malpractice (consent in advance of surgery), but later removed the nonsuit believing that it had "committed procedural error in granting the Defendant's Motion for Nonsuit *after* the Defendant's presentation of Dr. Jamieson's testimony." Trial Court Opinion at 10 (Emphasis added).

It is well-established in the law, without the need for extended citation, that this Court has the ability to affirm the order appealed for reasons other than those advanced by the court below. With this in mind, the determination that the trial court erred in permitting the defendant to introduce his expert's testimony prior to seeking a nonsuit was held to be harmless, the reasons which having already been stated need not be repeated here. See discussion supra.

Next, we respond to the defendant's claim (appearing as Issue III in his appellate brief) that the trial court abused its discretion in removing the compulsory nonsuit in the absence of medical evidence that an increased risk of harm existed (with a preoperative injury) which was not disclosed prior to surgery. In doing so, we reply to the plaintiff's argument that their expert (Dr. Axelrod) established that the preoperative fall (and all conduct subsequent thereto) "increased Mr. Kratt's intraoperative risks of suffering another cerebral event including a stroke." Appellee's Brief at 20.

In assessing whether the plaintiff established a prima facie case of medical malpractice to allow the case to go to trial, we find *Mitzelfelt v. Kamrin,* 526 Pa. 54, 584 A.2d 888 (1990) to be instructive.

In *Mitzelfelt,* the Supreme Court concluding that the plaintiff had presented a prima facie case of medical malpractice even though twenty percent of all patients undergoing the procedure performed upon the plaintiff did poorly after surgery. In particular, the high Court held that the expert's testimony met *Hamil v. Bashline's* [3] test allowing a case to go to the jury because: (1) the expert testified to a reasonable degree of medical certainty that the acts or omissions complained-of (drop in blood pressure of thirty points during surgery) "could cause" the type of harm (quadriplegia) that the appellant incurred; (2) the acts complained-of caused the actual harm suffered by the appellant, even though twenty percent of the patients do poorly after such an operation. "As such, it would have been impossible for any physician to state with a reasonable degree of medical certainty that the negligence actually caused the condition from which Mrs. Mitzelfelt suffered. The most any physician could say was that he believed, to a reasonable degree of medical certainty that it *could have* caused the harm. Once [the appellant's expert] rendered this opinion, it then became a question for the jury whether they believed it caused the harm in th[e] case." [4] 526 Pa. at 67, 584 A.2d at 894.

3. 481 Pa. 256, 392 A.2d 1280 (1978).

4. The relevant exchange consisted of the following:

Here, as in *Mitzelfelt,* the exchange between the plaintiff's expert and counsel did not establish "beyond all doubt" a causal link between the preoperative incident (fall/TIA) and the increased risk of intraoperative problems.[5]   However, such

> Q.   Doctor I asked you to advise everybody in this courtroom whether the type of injury that Mrs. Mitzelfelt suffered after this operation on August 7, 1981, is or is not necessarily a result of negligence or malpractice?
> A.   Not necessarily is the answer. *Nobody can be sure.* Twenty percent of these patients do badly, no matter what you do.
>
> \*      \*      \*      \*      \*      \*
>
> Q.   The bottom line is, do you know within a reasonable degree of medical certainty, can you tell the ladies and gentlemen of this jury within a reasonable degree of medical certainty that this drop in that blood pressure, that one reading to something between 85 and 90 millimeters of mercury caused the problem that Mrs. Mitzelfelt has?
> A.   No. It is my opinion that it could have, but I wouldn't put it as a reasonable degree of medical certainty.

526 Pa. at 60–62, 584 A.2d at 891 (Emphasis in original).

5.   As herein germane, the exchange went as follows:

> Q.   All right.   Doctor, I'm now going to ask you if you have an opinion within a reasonable degree of medical certainty as to whether the fall at 7:00 a.m. on December 31st at Hahnemann Hospital, the subsequent findings of the disoriented times two, the finding of the equivocal up-going toe, the CAT scan report of December 31st of 1985, if those conditions increased the risk of an intraoperative stroke to Mr. Kratt?
>
> \*      \*      \*      \*      \*      \*
>
> A.   Yes, I do.
> Q.   Okay.   And what is your opinion?
> A.   I think that there is the possibility that the fall before the surgery may have increased his operative risks.
> Q.   *Explain the reason for that.   You said possibility.   Explain what you mean by possibility, because possibility in a legal sense might mean could happen.*   Could you explain that in detail?
>
> \*      \*      \*      \*      \*      \*
>
> THE WITNESS: As I was mentioning, it could have been a transient ischemic attack that caused him to fall.   If it was, simply stumbling, if it was the effect of medications, either way, the man struck his head and was found by a physician to be disoriented to two of the three main—I guess qualifiers—that we use to judge a person's orientation.
>    In and of itself, that tells me that the person has suffered a concussion.   \* \* \* Regardless of whether he lost consciousness, and I believe that in and of itself goes under the general definition of a concussion.
>    So we have various possibilities as to what happened at 7:00 a.m. on December 3[1st], 1985[.]   \* \* \* I think that with these possibilities, including the possibility of a concussion, the possibility of a

a standard exceeds the "relaxed" burden of proving causation set forth in *Hamil v. Bashline* and reaffirmed in *Mitzelfelt*; to-wit:

> The expert who testified on behalf of the Mitzelfelts did not use the words "increased the risk of harm" in his opinion. However, when his testimony is taken as a whole, it clearly met that standard. Reviewing the evidence in the light most favorable to the verdict winner and "giving the benefit of every fact and every reasonable inference of fact" to the appellant, we believe that the appellant met the burden required. We do not require experts to use "the magic words" when testifying. Rather, we look to the substance of their testimony to determine whether it meets the standard required. "Section 323(a) was designed to

> > transient ischemic attack, I think that that event in and of itself put the patient at a higher risk of suffering from risks intraoperatively.
> >
> > \* \* \* \* \* \*
> >
> > A. My opinion is that the event in and of itself at 7:00 a.m. on December 31st, something happened, either a concussion or a TIA, some kind of a—some event occurred to his brain.
> > Q. Okay. Now, Doctor, let me ask you one other question. Do you have an opinion within a reasonable degree of medical certainty as to whether or not that was a material risk—a material risk was created by this event, which increased the risk of the subsequent intraoperative stroke that you've talked about?
> >
> > \* \* \* \* \* \*
> >
> > A. I feel that the—the event at 7:00 a.m. on December 31st did pose an increased risk to surgery, and it necessitated further informed consent from the—Mr. Kratt.
> >
> > \* \* \* \* \* \*
> >
> > [Q.] Let me just clarify, Doctor. I'm asking if you have an opinion within a reasonable degree of medical certainty as to whether the cerebral insult or cerebral event that you've spoken about increased the risks and was a substantial contributing factor in Mr. Kratt's intraoperative stroke or intraoperative cerebral event \* \* \*.
> > THE WITNESS: I believe that the presurgical fall, injury, TIA, whatever it was, yes, it did increase his intraoperative risks. As to did they actually—did that event actually cause worsening within the operating room, I can't say. But it's a possibility.
> > Q. Okay. The question really is, Doctor, whether or not you felt that this additional risk was a substantial contributing factor to the intraoperative cerebral event?
> > A. Yes, I believe it was a substantial factor. Reproduced Record 460a–461a, 463a, 464a, 470a, 471a, 474a–475a (Emphasis added).

*relax* a plaintiff's burden of proving causation, not to compound it."

In analyzing this case under the *Bashline* standard, we employ a two part test. The first step is to determine whether the expert witness for the appellants could testify to a reasonable degree of medical certainty that the acts or omissions complained of could cause the type of harm that the appellant suffered. In this Dr. Shenkin testified that a thirty point drop in blood pressure was significant enough to compromise the blood pressure to the spinal cord. Further, a compromise of the blood pressure to the spinal cord can cause paraparesis. As such, Dr. Shenkin's testimony rose to the level required by the first prong of the analysis.

The second step is to determine whether the acts complained of caused the actual harm suffered by the appellant. This is where we apply the relaxed standard. As the experts all testified, twenty percent of patients do poorly after this surgery. As such, it would have been impossible for any physician to state with a reasonable degree of medical certainty that the negligence actually caused the condition from which Mrs. Mitzelfelt suffered. The most any physician could say was that he believed, to a reasonable degree of medical certainty that it *could have* caused the harm. Once Dr. Shenkin rendered his opinion, it then became a question for the jury whether they believed it caused the harm in this case.

526 Pa. at 66–67, 584 A.2d at 894 (Citation omitted; emphasis in original).

Consistent with *Hamil/Mitzelfelt*, the plaintiff's expert testified that Mr. Kratt was transferred to Hahnemann Hospital for "urgent coronary bypass surgery" when conventional treatment (intravenous nitroglycerin) failed to reduce his "post infarction angina".

Despite proof (Plaintiff's P–2) that Mr. Kratt had been advised of the typical risks associated with coronary artery bypass surgery, the plaintiff's expert opined that the defendant should have advised the patient a second time, after his

fall and laceration of the forehead, of the potential risks associated with the bypass surgery given the increased risk of harm "possibly" caused by the fall. The expert premised this view upon an examination of the plaintiff's hospital records, which showed: (1) disorientation (times two)[6] after the fall; (2) neurological exam normal save for "an equivocal Babinski reflex on the left foot" (abnormal response: toes go up instead of in when the bottom of foot is stroked); (3) postoperatively the plaintiff was found to be "confused, agitated, combative, no real purposeful movement of any parts of his body. His arms and legs appeared to be just flailing about"; (4) the plaintiff pulled out Foley catheter and nasogastric tube after surgery; (5) CAT scan performed nine days after surgery (compared to preoperative CAT scan) showed "the patient ha[d] suffered a number of strokes";[7] and (6) renal failure "possibly due to [the plaintiff's] drop in blood pressure and ... arrhythmia...."[8] When the plaintiff's expert was asked whether he had an opinion within a reasonable degree of medical certainty "if those conditions increased the risk of an intraoperative stroke to Mr. Kratt?", he replied: "there [wa]s the possibility that the fall before surgery may have increased [the plaintiff's] operative risks."

Albeit the plaintiff's expert could not say with certainty what took place preoperatively (i.e., concussion or TIA), it was his opinion that "more likely than not some cerebral event did

6. Medical terminology for determining "awareness" falls into three categories: (1) You know who you are; (2) where you are; and (3) what time it is. At bar, the expert could not tell from the plaintiff's attending physician's report which one of the three elements were applicable to the plaintiff after the fall.

7. The plaintiff's expert reviewed the operative report which showed "episodes [of] ... hypotensive, the blood pressure dipp[ing] precipitously, and ... Mr. Kratt ha[ving] an atrial fibrillation, a sudden irregularity of the heart rhythm." This would account for the radiologist's (Dr. Hoover's) comments on the two CAT scans that the latter revealed cerebral hypoxia (lack of oxygen to the brain) and hypoperfusion (diminished blood circulation). Such things (i.e., a drop in blood pressure and an irregularity of the heart rhythm) "can create a situation where you have hypoperfusion of the brain ..., as well as cerebral hypoxia...."

8. After a stay in the hospital, the plaintiff was discharged, readmitted and succumbed to a cardiac demise on March 4, 1996.

take place after the consent form [was executed] on December 30th of 1985 at 8:00 p.m., [and] prior to the surgery of 12:00 noon, December 31st, 1985[.]" Such an event, within a reasonable degree of medical certainty, increased the risk of surgery and was a substantial contributing factor in causing the intraoperative cerebral event, so stated the plaintiff's expert.

We have taken into account the *entirety* of the plaintiff's expert's testimony, and not isolated portions as proposed by the defendant which focus on the phraseology: "possibility" of an increased risk of harm to the plaintiff by his preoperative fall and/or TIA. In doing so, we find that the *Hamil/Mitzelfelt* two-pronged test "relaxing" a plaintiff's burden of proving causation in a medical malpractice context has been met; namely:

(1) Plaintiff's expert could testify to a reasonable degree of medical certainty that the acts or omissions complained-of could cause ("more probable than not" impacted upon) the type of harm that the plaintiff suffered—cerebral insult substantial factor in increasing risk of harm; and

(2) Absence of medical certainty as to which cerebral event occurred to cause the condition for which the plaintiff suffered not required. Only necessary for doctor to say that he believed, to a reasonable degree of medical certainty that it "possibly" (expounded upon by the expert to mean "more probable than not" one of the cerebral events) caused the harm.

Once Dr. Axelrod rendered his opinion, it was then for the jury to decide whether to believe a cerebral event caused the harm in this case. The ruling of the court below being consistent with such a result, we will affirm the order removing the compulsory nonsuit.[9]

Order affirmed.

DEL SOLE, J. concurs in the result.

9. We wish to respond to the appellant's contention that the order removing the compulsory nonsuit was entered beyond the thirty-day jurisdictional time within which a court has to act to alter its original order. See 42 Pa.C.S.A. § 5505. Specifically, the appellant argues that

the court lacked the authority to remove the compulsory nonsuit, rendering its order a nullity. We disagree.

Our review of the record indicates that the plaintiff submitted a timely motion to remove the grant of the defendant's compulsory nonsuit (on 3/23/93), but presented it to the motion's court (4/1/93) instead of filing it via post-trial motions (until 11/15/93). This procedural misstep is not sufficient to defeat an otherwise timely presented motion.

As observed by the trial court, the defendant was aware that the plaintiff's Motion to Remove Compulsory Nonsuit was pending (albeit before motions court), yet he filed a praecipe for judgment on the verdict on 12/3/93 with the prothonotary.

The court acted properly in invalidating the prothonotary's judgment entered in favor of the defendant with the pendency of the plaintiff's motion to remove compulsory nonsuit. *Walley v. Iraca*, 360 Pa.Super. 436, 520 A.2d 886, 888 n. 1 (1987), citing *Murphy v. Brong*, 321 Pa.Super. 340, 468 A.2d 509, 511 (1983).