**Robert D. BILLMAN and Arlene R. Billman, H/W, Appellants,**

v.

**Richard F. SAYLOR, and Pottstown Memorial Medical Center, Appellees.**

Superior Court of Pennsylvania.

Argued Sept. 13, 2000.
Filed Oct. 26, 2000.

Robert L. Sachs, Philadelphia, for appellants.

Paul E. Peel, Plymouth Meeting, for Saylor, appellee.

BEFORE: DEL SOLE, HUDOCK and STEVENS, JJ.

STEVENS, J.:

¶1 This is an appeal from the order entered in the Court of Common Pleas of Montgomery County granting summary judgment in favor of Richard F. Saylor, M.D, thereby dismissing the case against him with prejudice, in an action for medical malpractice.[1] On appeal, Robert D. and Arlene R. Billman allege that summary judgment was improperly granted since (1) the trial court erred in finding Dr. Andrew Roberts' report to be insufficient to establish to a reasonable degree of medical certainty that Dr. Saylor's actions were negligent, and (2) the trial court erred in refusing to consider Dr. James Stinnett's expert report. We reverse and remand for further proceedings.

■ ¶2 Our scope of review is plenary when reviewing the propriety of a lower court's entry of summary judgment. *Schriver v. Mazziotti*, 432 Pa.Super. 276, 638 A.2d 224 (1994). Pursuant to Pennsylvania Rule of Civil Procedure 1035.2, summary judgment shall be rendered whenever (1) there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law, or (2) the adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action. We must examine the entire record in the light most favorable to the nonmoving party and resolve all doubts against the moving party when determining if there is a genuine issue of material fact. *Schriver, supra.*

¶3 The parties agree that there is no genuine issue of material fact and that the pertinent facts are as follows: On March 1, 1992, Mr. Billman was admitted to Pottstown Medical Center with pancreatitis, an elevated blood sugar level, and renal failure. On March 3, 1992, Dr. Saylor, specializing in vascular surgery, examined Mr. Billman because of vascular changes in Mr. Billman's left foot. An arteriogram[2] revealed that Mr. Billman was suffering from acute embolus.[3] Dr. Saylor recommended immediate surgery and, on that same date, Mr. Billman signed a consent form permitting Dr. Saylor to remove numerous blood clots from his left foot. Appellant was given morphine and Versed and, at approximately 8:00 p.m. on March 3, 1992, Mr. Billman was taken to the operating room, where he became agitated and uncooperative. Believing Mr. Billman had withdrawn his consent, Dr. Saylor cancelled the surgery. He did not contact Mrs. Billman or any other person in order to proceed with the surgery, and he did not administer any drugs which may have aided in dissolving the blood clots.

¶4 On March 4, 1992, Dr. Edith Behr examined Mr. Billman, and he consented again to surgery. On that same date, Mr. Billman was taken to the operating room so that the blood clots could be removed. Unfortunately, Dr. Behr determined that Mr. Billman's left leg needed to be amputated below the knee.

¶5 On October 6, 1993, the Billmans filed a complaint in medical malpractice against Dr. Saylor and Pottstown Medical Center alleging that Mr. Billman was rendered uncooperative on March 3, 1993 due to the medications prescribed to him and that Dr. Saylor should have proceeded with the surgery on that date.[4] The Bill-

---

1. On January 19, 2000, the trial court entered an order granting summary judgment as to Pottstown Memorial Medical Center (Pottstown Medical Center), the hospital where the surgery at issue occurred. However, Robert D. and Arlene R. Billman's notice of appeal and brief reveal that they are appealing the order entered in favor of Dr. Saylor only.

2. An arteriogram is a radiographic technique which is used to image arteries.

3. An embolus is a blood clot which moves inside of a blood vessel.

4. The Billmans further alleged that Dr. Saylor should have called Mrs. Billman to gain her consent, sought a psychiatric examination to determine competency, or administered anti-agitation drugs so that the surgery could have proceeded. We note that Mrs. Billman alleged loss of consortium.

mans further alleged that Dr. Saylor should have administered a blood-thinning drug once it was decided the surgery would not be proceeding and that his failure to do so increased the risk of amputation of Mr. Billman's left leg. In addition, the Billmans alleged that Pottstown Medical Center was negligent, *inter alia,* in failing to institute policies which would have required Dr. Saylor to call Mrs. Billman and mandate Dr. Saylor proceed with the operation.

¶ 6 Dr. Saylor and Pottstown Medical Center filed answers with new matter to the Billmans' complaint, and discovery commenced. On December 28, 1994, Dr. Saylor filed a motion to compel answers for interrogatories and the production of documents. On March 28, 1995, the Billmans filed a motion to compel Dr. Saylor's deposition, and, on June 1, 1995, the trial court entered an order directing Dr. Saylor to submit to a deposition within sixty days. Dr. Saylor was deposed on July 21, 1995, and May 15, 1996. On October 11, 1995, Pottstown Medical Center filed a motion to compel the Billmans to file an expert report, and, on June 7, 1996, the trial court filed an order directing the Billmans to file an expert report by July 1, 1996. On December 16, 1996, Dr. Saylor also filed a motion to compel the Billmans to submit an expert report in support of their claims. On Janaury 30, 1997, the trial court entered an order stating that the Billmans were required to provide an expert report supporting their claims of medical malpractice within thirty days or their expert testimony would be precluded.

¶ 7 On February 26, 1997, the Billmans filed the expert report of Dr. Andrews Roberts, and, on May 28, 1997, Dr. Saylor filed a motion for summary judgment against the Billmans alleging that Dr. Roberts' report did not state to a reasonable degree of medical certainty that Dr. Saylor was negligent, thereby resulting in the

Billmans' failure to produce evidence of facts essential to their cause of action. *See* Pa.R.C.P. 1035.2(2) (summary judgment may be granted where there are insufficient facts to make out a prima facie cause of action). On May 28, 1997, Pottstown Medical Center joined Dr. Saylor's motion for summary judgment, and, thereafter, the Billmans filed a supplemental expert report from Dr. James Stinnett and responses to the motions for summary judgment. The trial court granted summary judgment in favor of Dr. Saylor and Pottstown Medical Center and dismissed the Billmans' complaint with prejudice. The Billmans filed a petition for reconsideration, which was denied, and this timely appeal followed.

¶ 8 The Billmans allege that the trial court erred as a matter of law in determining that Dr. Roberts' report was insufficient to submit the issue of malpractice to the jury. Specifically, the Billmans allege that the trial court overlooked the fact that Dr. Roberts indicated that Dr. Saylor should have...anticoagulated [Mr. Billman] with heparin,[5] and that the failure to do so increased the likelihood of amputation.[6] Under *Mitzelfelt v. Kamrin,* 526 Pa. 54, 584 A.2d 888 (1990), and its progeny, the Billmans argue that there was sufficient evidence of an increased risk of harm to establish that Dr. Saylor did not exercise reasonable care, that the failure increased the risk of harm to Mr. Billman, and that the harm did in fact occur. As such, the Billmans contend, the question of whether Dr. Saylor's failure to give heparin to Mr. Billman was a proximate cause of Mr. Billman's amputation should have been left to the jury. We agree.

To state a *prima facie* cause of action for malpractice, a plaintiff must establish that (1) the physician owed a duty to the patient; (2) the physician breached that duty; (3) the breach of duty was the proximate cause of, or a substantial

---

**5.** Heparin is a blood-thinning drug.

**6.** On appeal, the Billmans have abandoned their contention that Dr. Roberts' report suffi-

ciently states, to a reasonable degree of medical certainty, that Dr. Saylor was negligent in failing to perform the surgery, despite Mr. Billman's resistance thereto.

factor in, bringing about the harm suffered by the patient, and (4) the damages suffered by the patient were the direct result of that harm.

*Eaddy v. Hamaty*, 694 A.2d 639, 642 (Pa.Super.1997) (citations omitted).

Our courts have held that because 'the complexities of the human body place questions as to the cause of pain or injury beyond the knowledge of the average layperson,' a medical malpractice plaintiff generally must produce the opinion of a medical expert to demonstrate the elements of his cause of action.

*Miller v. Sacred Heart Hospital*, 753 A.2d 829, 833 (Pa.Super.2000) (citation and quotation omitted).[7] Where the plaintiff fails to present such an expert witness, summary judgment may be properly granted. *Miller, supra.*

■ ¶ 9 In *Mitzelfelt, supra,* the Pennsylvania Supreme Court explained that in some cases, the standard of proof regarding medical expert testimony is an impossible standard. These are the cases in which, irrespective of the quality of the medical treatment, a certain percentage of patients will suffer harm. *Id.* at 62, 584 A.2d at 892. In such cases, where the plaintiff is unable to show to a reasonable degree of medical certainty that the physician's actions/omissions caused the resulting harm, but is able to show to a reasonable degree of medical certainty that the physician's actions/omissions increased the risk of harm, the question of whether the conduct caused the ultimate injury should be submitted to the jury. *See Montgomery v. South Philadelphia Medical Group, Inc.*, 441 Pa.Super. 146, 656 A.2d 1385 (1995).

An example of this type of case is a failure of a physician to [make a timely

diagnosis]. Although timely detection of a [disease or medical condition] may well reduce the likelihood that a patient will have a terminal [or adverse] result, even with timely detection and optimal treatment, a certain percentage of patients unfortunately will succumb to the disease. This statistical factor, however, does not preclude a plaintiff from prevailing in a lawsuit. Rather, once there is testimony that there was a failure to detect the cancer in a timely fashion, and such failure increased the risk that the [plaintiff] would have either a shortened life expectancy or suffered harm, then it is a question for the jury whether they believe, by a preponderance of the evidence, that the acts or omissions of the physician were a substantial factor in bringing about the harm.

*Mitzelfelt*, 526 Pa. at 62–63, 584 A.2d at 892. *See Wolloch v. Aiken*, 756 A.2d 5 (Pa.Super.2000). Another example of this type of case includes cases where a patient's blood pressure was permitted to drop to a low level during surgery, *Mitzelfelt, supra,* and cases where a patient's preoperative fall increased the risk of surgery, *Kratt v. Horrow*, 455 Pa.Super. 140, 687 A.2d 830 (1996), *abrogated on other grounds, Harnish v. School District of Philadelphia*, 557 Pa. 160, 732 A.2d 596 (1999).

■ ¶ 10 With regard to the degree of certainty required in such cases, it is relaxed.

[T]he expert need not testify with absolute certainty or rule out all other possible causes for the harm suffered by the patient. The expert in these cases has been permitted to testify under the relaxed degree of certainty enunciated in Section 323(a) of the Restatement (Second) of Torts,[8] that the defendant's fail-

7. Where the lack of skill or want of care is so obvious that it is within the range of ordinary experience and comprehension of lay persons, a plaintiff need not present expert testimony. *See Miller, supra.* However, we conclude as a matter of law that such was not the case here.

8. Section 323 of the Restatement (Second) of Torts provides: One who undertakes, gratu-

itously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

ure to exercise reasonable care in the diagnosis and treatment increased the risk of harm.

Although preferred, the expert is not necessarily required to use the 'magic words' of 'increased the risk,' so long as the opinion is expressed to the requisite degree of medical certainty. The substance of the expert testimony is viewed in its entirety to determine whether it has expressed the appropriate standard of certainty.

*Wolloch*, 756 A.2d at 15 (citations omitted). *See Montgomery, supra.*

In analyzing this case under the [*Mitzelfelt*] standard, we employ a two part test. The first step is to determine whether the expert witness for the appellants could testify to a reasonable degree of medical certainty that the acts or omissions complained of could cause the type of harm that the appellant suffered.... The second step is to determine whether the acts complained of caused the actual harm suffered by the appellant. This is where we apply the relaxed standard.

*Kratt*, 687 A.2d at 834–835.

¶ 11 We conclude that the case at issue falls within the class of cases where the plaintiff is unable to show to a reasonable degree of medical certainty that the physician caused the resulting harm, but is able to show to a reasonable degree of medical certainty that the physician's action/omission increased the risk of harm, and that Dr. Roberts sufficiently stated this proposition. As such, we must determine whether Dr. Roberts stated an opinion with the requisite amount of certainty. In making this determination, we shall examine a letter dated November 20, 1996, which was sent to Dr. Roberts from the Billmans' attorney, and Dr. Roberts' report filed in response thereto.

¶ 12 The November 20, 1996 letter stated, in relevant part, the following:

(a) his failure to exercise such care increases the risk of harm, or
(b) the harm is suffered because of the other's reliance upon the undertaking.

In 1995, I asked you to perform a medical-legal review of the above-captioned case. At that time, you had an opportunity to preliminarily review the applicable medical records. We have now had a chance to take the deposition of the defendant physician, Dr. Saylor. I am enclosing relevant portions from the May 15, 1996 deposition of Dr. Saylor.

After you have had the chance to go through the testimony of Dr. Saylor, would you kindly consider the following questions:

1. When Mr. Billman purportedly withdrew his consent to the surgery on the evening of March 3, 1992 at a time when he was described as agitated and uncooperative, did Dr. Saylor have an obligation to take further steps (for example contacting Mrs. Billman by telephone and asking for her to come to the hospital immediately) in order to obtain consent to perform the limb-saving surgery on Mr. Billman?

2. Did Dr. Saylor's failure to take further steps to obtain either Mr. Billman's consent or the involvement of Mrs. Billman to consent in lieu of Mr. Billman fall below the applicable standard of care?

3. Would Mr. Billman's chances of limb salvage have been substantially better if surgery had been performed as planned on March 3, 1992 at approximately 8:30 p.m.?

4. When surgery was not performed at approximately 8:30 p.m. on March 3, 1992, should Mr. Billman have been started on heparin and clot lysis therapy? Would such treatments have increased the chances of limb salvage?

5. Did the 14 hour delay in performing the thrombectomy significantly decrease the chance of limb salvage?

Restatement (Second) of Torts Section 323.

¶ 13 To this letter, Dr. Roberts responded, in relevant part, as follows:

I have reviewed the sections of Dr. Saylor's deposition. These are my initial thoughts in attempting to address the questions you raised. Three of them I can answer very quickly and easily. The first is that Mr. Billman's chances of limb salvage would have been substantially better if surgery had been performed on March 3, 1992 than on the following day. The second question involved heparin or lytic therapy. Considering Mr. Billman's medical situation, I believe lytic therapy would have been problematic, and the results of systemic lytic therapy for arterial emboli are fair, at best. **However, unless Mr. Billman had a clear-cut contraindication to anticoagulation (which I don't believe he had), he should have been anticoagulated with heparin. Such treatment would have increased the chances of limb salvage.** Your final question was about the fourteen-hour delay. I again believe there is little question that the delay significantly decreased Mr. Billman's chance of limb salvage.

Now your first two questions are much more difficult. I have asked a number of my colleagues their thoughts about this case. The consensus of all of us is that Dr. Saylor should have contacted Mrs. Billman and certainly, ideally, asked her to come and see if she could change her husband's mind. Under the circumstances, all of us could easily understand why Dr. Saylor would have found his position irritating in the extreme, and everyone certainly has sympathy with his course of action, even if all felt (as I suspect he does, in retrospect) that further effort would have been preferable.

Your next question was the obvious legal one of Dr. Saylor's actions falling below the applicable standard of care. I spoke to four different surgeons, and every one of us felt the same way-that we would be very hesitant to come down that strongly. Is there any legal precedent for this? Needless to say this is a very tricky question which is filled with nuance.

(emphasis added).

■ ¶ 14 Viewing the letter dated November 20, 1996, and Dr. Roberts' response with regard thereto in their entirety, we determine that Dr. Roberts sufficiently stated to a reasonable degree of medical certainty that Dr. Saylor's failure to administer heparin increased the risk of Mr. Billman losing his leg. Dr. Roberts clearly stated that [Mr. Billman] should have been anticoagulated with heparin. Such treatment would have increased the chances of limb salvage. As such, the issue of causation regarding Dr. Saylor's failure to administer heparin should have been submitted to the jury. *See Mitzelfelt, supra* (holding that where the expert testified that the drop in blood pressure was sufficient to increase the likelihood of paraparesis, issue should have been submitted to the jury); *Montgomery, supra* (holding that where plaintiff in medical malpractice action has alleged that defendant's conduct increased the risk of injury, defendant will not be relieved from liability merely because plaintiff's medical expert was unable to say with certainty that defendant's act caused harm; so long as reasonable minds can conclude that defendant's conduct was substantial factor in causing harm, issue of causation may go to the jury).

¶ 15 We note that Dr. Roberts' hesitancy to state that Dr. Saylor's actions fell below the applicable standard of care does not require a different result in this case. We conclude that, when read in its entirety and in connection with the November 20, 1996 letter, Dr. Roberts was indicating that he could not state with a reasonable degree of medical certainty that Dr. Saylor should have received consent from someone other than Mr. Billman and should have proceeded with the surgery. The issue of consent/proceeding with the surgery is an issue separate from whether Dr.

Saylor should have administered heparin until the surgery could be performed at a later date.

¶ 16 The Billmans' final allegation is that the trial court erred in refusing to consider Dr. James Stinnett's expert report in determining whether summary judgment should have been granted. In light of our foregoing discussion, we find it unnecessary to discuss this issue further.

¶ 17 For all of the foregoing reasons, we reverse the trial court's order granting summary judgment as to Dr. Saylor and remand for further proceedings.

¶ 18 Reversed; Remanded; Jurisdiction Relinquished.