J-A08018-15

2015 PA Super 177

| K.H., A MINOR, BY HIS PARENT AND NATURAL GUARDIAN, H.S., AND PARENT AND GUARDIAN, E.H., IN THEIR OWN RIGHT | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellants | |
| v. | |
| SHAKTHI M. KUMAR, M.D., ET AL | |
| Appellee | No. 497 MDA 2014 |

Appeal from the Judgment Entered on February 19, 2014
In the Court of Common Pleas of Lancaster County
Civil Division at No.: CI-09-00313

BEFORE:  SHOGAN, J., WECHT, J., and STRASSBURGER, J.[*]

OPINION BY WECHT, J.:                    **FILED AUGUST 25, 2015**

K.H. through his parents, H.S. and E.H.,[1] and his parents individually (collectively, "Appellants"), appeal the trial court's November 27, 2013, and February 19, 2014 orders granting summary judgment in favor of Appellees Shakthi Kumar, M.D.; Yvonne Siwek, M.D.; Lancaster Pediatric Associates, Ltd. ("Lancaster Pediatric"); Donald Diverio, Jr., D.O.; AO Orthopedics, Inc.; Vincent Avallone, Jr., D.O.; Julie A. Mack, M.D.; Gene C. Smigocki, M.D.; Lancaster Radiology Associates, Ltd. ("Lancaster Radiology"); Lancaster General Hospital ("LGH"), Atilla Devenyi, M.D.; and Regional

_____

[*]    Retired Senior Judge assigned to the Superior Court.

[1]    K.H.'s biological father, as explained *infra*, is C.S.  E.H. married H.S. after the events underlying this lawsuit transpired.

Gastroenterology Associates of Lancaster, Ltd. ("Regional Gastroenterology") (collectively, "Appellees"), and dismissing Appellants' amended complaint with prejudice. Although this case nominally presents several issues, their resolution principally rests upon our answer to one question: Whether, as the trial court ruled, the lack of an express statutory civil remedy under the Child Protective Services Law ("CPSL"), 23 Pa.C.S. §§ 6301, *et seq*., implicitly precludes a common-law remedy in tort for harms sustained due to child abuse when a physician has failed to report reasonable suspicions that a child is a victim of abuse to the government authorities designated by the CPSL. After careful review of the record and the seventeen party briefs filed in this case, we reverse and remand for further proceedings.

## I.    Introduction

This case presents this Court with various challenges to two trial court orders that entered summary judgment for Appellees and collectively dismissed all of Appellants' claims against the Appellees. Motions for summary judgment are governed by Pa.R.C.P. 1035.2, which provides as follows:

> After the relevant pleadings are closed, but within such time as not to unreasonably delay trial, any party may move for summary judgment in whole or in part as a matter of law
>
> (1)    whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report, or
>
> (2)    if, after the completion of discovery relevant to the motion including the production of expert reports, an

> adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury.

Pa.R.C.P. 1035.2.

In reviewing an order granting or denying summary judgment, we apply the following standard:

> We must examine the entire record in the light most favorable to the non-moving party and resolve all doubts against the moving party when determining if there is a genuine issue of material fact. We will only reverse the lower court's grant of summary judgment if there is a manifest abuse of discretion. Summary judgment should be granted only in cases where the right is clear and free of doubt. Summary judgment serves to eliminate the waste of time and resources of both litigants and the courts in cases where a trial would be a useless formality.

*First v. Zem Zem Temple*, 686 A.2d 18, 20 (Pa. Super. 1996) (citations and internal quotation marks omitted).

> Although it is clear that a jury is not permitted to reach a verdict based upon guess or speculation, it is equally clear that a jury may draw inferences from all of the evidence presented. *Cade v. McDanel*, 679 A.2d 1266 (Pa. Super. 1996).

> It is not necessary, under Pennsylvania law, that every fact or circumstance point unerringly to liability; it is enough that there be sufficient facts for the jury to say reasonably that the preponderance favors liability. . . . The facts are for the jury in any case whether based upon direct or circumstantial evidence where a reasonable conclusion can be arrived at which would place liability on the defendant. It is the duty of [the] plaintiffs to produce substantial evidence which, if believed, warrants the verdict they seek. . . . A substantial part of the right to trial by jury is taken away when judges withdraw close cases from the jury. . . .

> *Id.* at 1271 (quoting ***Smith v. Bell Tel. Co. of Penna.***, 153 A.2d 477, 480 (Pa. 1959)).

***First***, 686 A.2d at 21 (citations modified).

## II.   FACTUAL AND PROCEDURAL HISTORY

As noted, we are constrained in this procedural posture to grant Appellants the most favorable account of the evidence of record.   For present purposes, the trial court's account of the factual background and procedural history of this case suffices.

> [K.H.] was born to [H.S.] and her former husband, [C.S.], on June 29, 2002 at [LGH].   [K.H.] was born prematurely at thirty-three weeks['] gestation as a result of maternal preeclampsia. Following his birth, [K.H.] was admitted to the Neonatal Intensive Care Unit where he remained until his release from the hospital on July 15, 2002.   After his discharge, [K.H.] was monitored by Dr. Shakthi Kumar at [Lancaster Pediatric].   [K.H.] suffered from respiratory, cardiac and gastrointestinal complications due to his prematurity, and was admitted to LGH on five occasions in July and August of 2002 pursuant to these issues.
>
> On September 9, 2002, [H.S.] took [K.H.] to [Lancaster Pediatric] with symptoms including congestion, spitting up, wheezing and refusing to sleep and eat.   [K.H.] was examined by Dr. Yvonne Siwek, who ordered a chest X-ray.   The X-ray was performed and read by Dr. Julie Mack at LGH.   Dr. Mack noted that [K.H.'s] lungs were clear, but that the X-ray showed healing fractures of the fifth and sixth ribs and flattening of the vertebral bodies at T8, T9, T12, L2, L3 and L4.   Dr. Mack discussed her findings with Dr. Siwek by telephone.   While concerned about the potential of child abuse, Dr. Mack concluded that the more likely cause of the injuries was a congenital issue secondary to [K.H.'s] premature birth.   Dr. Siwek memorialized the conversation with an entry in her office chart and referred [K.H.] to Dr. Donald Diverio, a pediatric orthopedist at AO Orthopedics.
>
> On September 12, 2002, [K.H.] was examined by Dr. Diverio. Dr. Diverio noted that [K.H.] became irritable upon palpation of

his ribs. Dr. Diverio additionally reviewed the September 9th X-rays. At the conclusion of the office visit, Dr. Diverio accused [H.S. and C.S.] of child abuse.[1] After the appointment, [H.S. and C.S.] took [K.H.] to see Dr. Kumar and told her about Dr. Diverio's allegations. [Appellants] assert that, following their conversation, Dr. Kumar called Dr. Diverio and discussed [K.H.'s] injuries with him.

_____

[1] During his deposition, Dr. Diverio denied accusing [H.S. and C.S.] of abusing [K.H.]. Nevertheless, for summary judgment purposes, viewing the record in the light most favorable to the non-moving party, the [c]ourt will assume that these allegations were made as pled in Plaintiffs' Amended Complaint.

Later the same day, [K.H.] underwent a bone survey performed and read by Dr. Mack at LGH. Dr. Mack's report identified healing rib fractures and vertebral deformities.

On October 2, 2002, [K.H.] was seen by Dr. Atilla Devenyi, a gastroenterologist at [Regional Gastroenterology]. Dr. Devenyi examined [K.H.] and noted a rash or bruise on his sternum and chest wall. Dr. Devenyi reported his findings to Dr. Kumar. [K.H.] was seen in Dr. Kumar's office on October 3, 2002, where she also observed the mark on his lateral chest wall and sternum. Dr. Kumar noted in her office chart, "Seen by Dr. Devenyi yesterday. Ordered PT/PTT, CBC with platelets for a pattern seen on the chest that was suspicious for abuse. He also ordered a skeletal survey[.]" Later that day, Dr. Kumar spoke with Dr. Devenyi about the skeletal survey and laboratory tests that he ordered, and, following their conversation, the tests were canceled.

On December 3, 2002, [K.H.] presented at [Lancaster Pediatric] for an appointment with Dr. Kumar. Dr. Kumar examined [K.H.] and noted an increase in the size of his head as well as a bruise on his forearm. On December 6, 2002, [K.H.] underwent a chest X-ray at LGH. Dr. Mack read the X-ray and reported[] "minimal deformity of [the] anterior lateral 7th rib compatible with [a] remote healing fracture" as well as "smooth periosteal reaction involving both humeri[.]" Dr. Mack additionally noted, "if there is any clinical concern of non-accidental trauma, full skeletal series should be performed[.]"

On December 6, 2002, [K.H.] underwent an ultrasound of his head at LGH. Dr. Gene Smigocki read and interpreted the ultrasound and noted, "no evidence of hydronephrosis. Asymmetrically prominent left frontal horn. No hemorrhage[."]

On December 18, 2002, [K.H.] was discovered at home in his crib unresponsive by [C.S.] and was rushed to LGH. A CT scan of his head was performed[,] which showed a left frontal intracranial hemorrhage. Consequently, [K.H.] was transported via helicopter to Milton S. Hershey Medical Center. It was later confirmed that [K.H.] had suffered non-accidental injuries including "contusion in the high left parietal region with surrounding edema with mass effect, interhemispheric subdural hematoma, tentorium subdural hematoma, and small left frontoparietal subdural hematoma[."] It was additionally determined that [K.H.] suffered these injuries because he was shaken. As a consequence of this incident, [C.S.] was charged with and convicted of felony child abuse and is currently serving a five- to ten[-]year prison sentence.

[Appellants] claim that, as a result of his injuries, [K.H.] suffers from permanent brain damage and seizures, physical and neurodevelopmental deficits, disabilities and delays, delayed growth and development, and other physical traumas. [Appellants] additionally allege that [K.H.] has sustained numerous personal injuries including substantial pain and suffering, mental anguish, loss of life's pleasures, humiliation, embarrassment and disfigurement.

On January 13, 2009, [H.S.] and her current husband, [E.H.], on behalf of [K.H.] and in their own right, filed a Complaint for medical professional liability in the Lancaster County Court of Common Pleas. In the Complaint, [Appellants] asserted negligence claims against Dr. Kumar, Dr. Siwek, [Lancaster Pediatric], Dr. Diverio, AO Orthopedics, Dr. Mack, [Lancaster Radiology,] and LGH, alleging that they collectively failed to recognize, treat and report child abuse pursuant to Pennsylvania's [CPSL] §§ 6311 and § 6313.[2] [Appellees] filed

_____

2 Specifically, section 6311 of the CPSL obligates, *inter alia*, any person "licensed or certified to practice in any health-related field under the jurisdiction of the Department of State," as well as any "employee of a health care facility or provider licensed by the Department of Health, who is

*(Footnote Continued Next Page)*

Preliminary Objections in the nature of a demurrer, which [o]bjections were overruled without [o]pinion by the Honorable Dennis E. Reinaker on October 13, 2009. On November 19, 2009, the Court amended its [o]rder overruling the [p]reliminary [o]bjections to include a certification for immediate interlocutory appeal to the Superior Court. [Appellees] then filed a "Petition for Allowance of Appeal" with the Superior Court[,] which was denied via a *per curiam* [o]rder on February 16, 2010.

On August 11, 2011, [Appellants] filed an Amended Complaint containing additional claims of negligence against Dr. Avallone, Dr. Smigocki, Dr. Devenyi and [Regional Gastroenterology], alleging that they also failed to report a suspicion of child abuse pursuant to the CPSL. Moreover, [Appellants] asserted medical negligence claims against Drs. Mack and Smigocki based upon misreads of radiographic imaging. [Appellees] demurred a second time, and their [p]reliminary [o]bjections were overruled again without [o]pinion by Judge Reinaker on January 4, 2012. On June 22, 2012, the case was reassigned to me [*i.e.*, Judge Wright].

With discovery now complete, [Appellees] have filed Motions for Summary Judgment seeking to dismiss [Appellants'] claims against them. In their [m]otions, [Appellees] assert that summary judgment is warranted because the CPSL does not create a private civil cause of action for violation of the reporting requirements contained in 23 Pa.C.S.A. § 6311 and § 6313. Further, [Appellees] argue that Pennsylvania law does not authorize negligence *per se* claims based upon violations of the

*(Footnote Continued)* ———————————

engaged in the admission, examination, care or treatment of individuals" to "make a report of suspected child abuse . . . if the person has reasonable cause to suspect that a child is a victim of child abuse." 23 Pa.C.S. §§ 6311(a)(1), (3). Notably, subsection 6311(b)(3) provides that "[n]othing in this section shall require the mandated reporter to identify the person responsible for the child abuse to make a report of suspected child abuse." Section 6313 directs the reporting procedure, requiring a mandated reporter to "immediately make an oral report of suspected child abuse to the department via the Statewide toll-free telephone number . . . or a written report using electronic technologies," and further directs that an oral reporter submit a written report to the assigned department or agency within forty-eight hours.

CPSL, and that there is no common[-]law duty for a physician to report a reasonable suspicion of child abuse. Additionally, [Appellees] contend that, even if the [c]ourt recognizes a duty for physicians to report suspected child abuse, [Appellants] cannot establish that [Appellees'] conduct was the legal cause of [K.H.'s] injuries. Finally, LGH asserts that [Appellants] have failed to establish that they are liable for the conduct of the physicians through the doctrine of ostensible agency, or that the hospital engaged in corporate negligence.

Trial Court Opinion ("T.C.O."), 11/27/2013, at 2-6 (citations omitted).

After reviewing Appellees' various arguments, the trial court entered partial summary judgment as follows:

[Appellees'] Motions are granted insofar as all of [Appellants'] claims based upon [Appellees'] alleged failure to recognize, treat and report reasonable suspicions of child abuse are dismissed. LGH's Motions are also granted as to [Appellants'] corporate negligence claims related to the hospital's failure to adopt policies to ensure quality care for the patient and to select and retain competent physicians. However, Dr. Mack, Dr. Smigocki, [Lancaster Radiology] and [LGH's] [m]otions are denied with respect to any averments of negligence that are specifically premised on the misinterpretation of radiological studies by Drs. Mack and Smigocki, and the vicarious liability of Lancaster Radiology Associations and [LGH] on these medical malpractice claims.

Order, 11/27/2013, at 1-2.

The parties thereafter filed motions for reconsideration. After reviewing the motions, the trial court entered an order denying Appellants' motion for reconsideration, granting Appellees' motion for reconsideration, and dismissing Appellants' amended complaint in its entirety. **See** Order, 2/19/2014, at 1. The trial court order included a footnote explaining the

court's reversal of course as to those claims that initially survived summary judgment:

> Upon further review of [Appellants'] expert reports submitted by Drs. [Alan E.] Oestreich and [James] Abrahams, the [c]ourt determined that, while both experts initially opine that Drs. Mack and Smigocki misinterpreted [K.H.'s] radiographic studies, they ultimately conclude that the only damage caused by these errors was that the physicians failed to recognize and report suspected child abuse. The [c]ourt has already determined that Pennsylvania law does not authorize a private cause of action against a physician for failure to report suspected child abuse. Accordingly, [Appellees'] Motion for Reconsideration must be granted.

*Id.* at 1 n.1. The trial court's February 19, 2014 order rendered final the court's entry of summary judgment for Appellees as to all of Appellants' claims. This timely appeal followed.

On March 18, 2014, the trial court directed Appellants to file a concise statement of the errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), and Appellants timely complied on April 8, 2014. On April 30, 2014, the trial court issued its Rule 1925(a) opinion, which directed this Court's attention to the explanations provided in its lengthy November 27, 2013 opinion, which coincided with its initial order entering partial summary judgment.

## II. DISCUSSION

Appellants raise the following issues for review:

> 1. Did the trial court commit an error of law by granting summary judgment in favor of [Appellees] on purely legal issues that had been decided in favor of [Appellants] on preliminary

objections by a judge of coordinate jurisdiction where no new law or evidence was presented?

2 Did the trial court commit an error of law by granting summary judgment in favor of [Appellees] on [Appellants'] legally cognizable claims for professional medical negligence based on [Appellees'] departure from the applicable standard of care where [Appellants] established a duty based on the [Appellees'] admissions and expert opinions?

3. Did the trial court commit an error of law by granting summary judgment on [Appellants'] anticipated request for a negligence *per se* jury instruction at trial?

4. Did the trial court commit an error of law by granting summary judgment in favor of [Appellees] where the record contained more than adequate evidence, including multiple expert reports, demonstrating [that Appellees'] medical negligence increased the risk of harm to [K.H.]?

5. Did the trial court commit an error of law by granting summary judgment in favor of [LGH] on [Appellants'] claims for corporate negligence where the record contained more than sufficient evidence that [LGH] failed to have appropriate policies in place for the retention and availability of patients' prior radiology studies, and failed to have adequately trained, experienced, and qualified physicians to read pediatric radiographs?

Brief for Appellants at 4-5 (footnote omitted).[3]

**A. The Coordinate Jurisdiction Doctrine Does Not Preclude the Trial Court from Granting Summary Judgment.**

Appellants' first issue is the easiest to resolve, requiring only brief discussion. As noted, *supra*, the trial court's entry of summary judgment for Appellees hinged principally, perhaps exclusively, upon the proposition that

---

[3] Issues two and four overlap sufficiently that we will consider them together as Appellants' second issue.

Appellants' claims, however denominated, amounted to claims for civil relief for violations of the CPSL's reporting obligations. In effect, Appellants argue that Judge Reinaker, the first judge assigned this case, conclusively decided this issue in their favor. Consequently, the coordinate jurisdiction rule barred Judge Wright, to whom the matter later was assigned, from granting summary judgment for Appellees. We disagree.

Our Supreme Court has described the coordinate jurisdiction rule as follows:

> Generally, the coordinate jurisdiction rule commands that[,] upon transfer of a matter between trial judges of coordinate jurisdiction, a transferee trial judge may not alter resolution of a legal question previously decided by a transferor trial judge. More simply stated, judges of coordinate jurisdiction should not overrule each other's decisions.
>
> The reason for this respect for an equal tribunal's decision . . . is that the coordinate jurisdiction rule is based on a policy of fostering the finality of pre-trial applications in an effort to maintain judicial economy and efficiency. Furthermore, . . . the coordinate jurisdiction rule serves to protect the expectations of the parties, to [e]nsure uniformity of decisions, to maintain consistency in proceedings, to effectuate the administration of justice, and to bring finality to the litigation.

*Zane v. Friends Hosp.*, 836 A.2d 25, 29 (Pa. 2003) (citations modified; internal quotation marks omitted).

The trial court addressed this issue only briefly in its Rule 1925(a) opinion, rejecting Appellants' argument by reference to this Court's decision in *Salerno v. Philadelphia Newspapers, Inc.*, 546 A.2d 1168, 1170 (Pa. Super. 1988). In *Salerno*, this Court made the following observations:

> [The coordinate jurisdiction rule] is not intended to preclude granting summary judgment following denial of preliminary objections. "The failure to present a cause of action upon which relief can be granted may be raised at any time. A motion for summary judgment is based not only upon the averments of the pleadings but may also consider discovery depositions, answers to interrogatories, admissions and affidavits." *Austin J. Richards, Inc., v. McClafferty*, 538 A.2d 11, 14-15 n.1 (Pa. Super. 1988). We can discern no reason for prohibiting the consideration and granting of a summary judgment if the record as it then stands warrants such action. *Cf. DiAndrea v. Reliance S.&L. Ass'n*, 456 A.2d 1066, 1069 (Pa. Super. 1983). This is particularly true when the preliminary objections were denied without an opinion. *Farber v. Engle*, 525 A.2d 864 (Pa. Cmwlth. 1987).

*Salerno*, 546 A.2d at 1170 (citations modified).

Appellants counterpose, *inter alia*, our Supreme Court's decision in *Goldey v. Trustees of Univ. of Penna.*, 675 A.2d 264 (Pa. 1996). In this Court's decision preceding the Supreme Court's review, we appeared to expand *Salerno*'s reliance upon the lack of trial judge opinion in connection with denying preliminary objections to a far broader spectrum of motions and procedural contexts. This Court's ruling to that effect, our Supreme Court observed, "stretched far beyond the exception stated in *Salerno*, which was grounded in the differences between preliminary objections and summary judgment motions." *Goldey*, 675 A.2d at 267. The Supreme Court, emphasizing that the "presence or absence of an opinion in support of the initial ruling is not controlling," held without qualification that, "[w]here the motions differ in kind, as preliminary objections differ from motions for judgment on the pleadings, which differ from motions for summary

- 12 -

judgment, a judge ruling on a later motion is not precluded from granting relief although another judge has denied an earlier motion." *Id.*

Appellants seek to distinguish *Salerno* from the instant case on the basis that, in the instant case, the record relevant to the purely legal issues raised on summary judgment before Judge Wright was no more expansive than the record as it appeared to Judge Reinaker when he overruled Appellees' preliminary objections. Brief for Appellants at 27. For this reason, Appellants argue that the procedural context is immaterial, because the spirit of the coordinate jurisdiction rule was violated when the trial court accepted these arguments after they were rejected earlier by a different judge. *Id.* at 27-28.

In the strongest of the Appellees' various briefs on this subject,[4] Appellee Dr. Devenyi cites, *inter alia*, *Mellon Bank, N.A., v. National Union Insurance Co. of Pittsburgh, PA*, 768 A.2d 865 (Pa. Super. 2001), as controlling authority. Brief for Dr. Devenyi, AO Pediatric Associates, Inc., and Dr. Avallone at 11-12 ("Brief for Devenyi"). In that case, one judge overruled preliminary objections asserted on the basis that the claimant in

---

[4] In sum, this Court is confronted with seventeen briefs—Appellants' primary brief, eight responsive briefs by Appellees, and Appellants' reply brief to each responsive brief. In the discussion that follows, references to individual Appellees' arguments will occur only rarely, because their arguments tend to be shared, incorporated by reference, or materially the same. Except when circumstances warrant otherwise, we will simply refer to "Appellees'" arguments.

that case was not an insured, and did not provide an explanatory opinion. Later, when the same issue was raised before a different judge in a motion for summary judgment that did not present any new evidence in support of dismissal, this Court, citing **Goldey**, held that the differing nature of the two motions sufficed to preclude application of the coordinate jurisdiction rule.

We agree that **Mellon Bank** is controlling. Consequently, we find it immaterial whether, in fact, the decisional record on summary judgment before Judge Wright varied at all from what Judge Reinaker had at his disposal in reviewing Appellees' preliminary objections. Under **Mellon Bank**, the procedural context alone precludes application of the coordinate jurisdiction rule. Accordingly, we reject Appellants' argument that Judge Wright was barred from granting Appellees summary judgment by Judge Reinaker's prior contrary ruling in the context of preliminary objections.

**B.    Appellants Do Not Seek to Establish a Civil Cause of Action Under the CPSL.**

In taking up the questions presented as issues two and four, we cannot address whether Appellants set forth a *prima facie* case of medical malpractice in various particulars before first addressing the trial court's and Appellees' conclusions that Appellants seek relief that necessarily sounds in a putative civil violation of the CPSL, a statute that expressly provides only criminal sanctions against physicians who "willfully" fail to comply with its terms. **See** 23 Pa.C.S. § 6319(a)(1). The trial court ruled that the absence of an express provision in the CPSL providing for such a claim necessarily

signals the exclusion of any civil cause of action based upon a failure to report child abuse, requiring dismissal of all of Appellants' claims.

Only Appellee Regional Gastroenterology Associates of Lancaster—in a mere two sentences—addresses this issue in the terms that we find conclusive: "In their Brief, Appellants concede that the [CPSL] does not create a private cause of action against Appellees. [Regional Gastroenterology] accepts this concession." Brief for Regional Gastroenterology at 2. We agree.[5]

That being said, Appellees' arguments suggest that Appellants' claims, even if framed as common-law medical malpractice, **necessarily** depend upon the existence of a civil remedy under the CPSL. Appellees in effect assert that Appellants may not obtain the benefit of their artful pleading in seeking to invent a private cause of action that the legislature implicitly declined to create. Notably, Appellees offer no controlling or entirely on-

_____

[5] Appellants unnecessarily complicate their own position by suggesting that Regional Gastroenterology's assertion that Appellants concede the matter "misses the point." Reply Brief of Appellants to Brief of Regional Gastroenterology at 2 (unnumbered). Appellants elaborate that, "[w]hile the CPSL may not include an express private cause of action, [Appellants] have not sought to recover under the statutory provisions of the CPSL." **Id.** This strikes us as a distinction without a difference. In any event, even if Appellants did not disavow any such claim, we would find it waived for want of argument in support of such a position. **See Commonwealth v. Veon**, 109 A.3d 754, 774 (Pa. Super. 2015) (deeming an issue waived under Pa.R.A.P. 2119(a) because the appellant failed to provide a "properly developed argument").

point case law establishing the necessity of construing Appellants' claims in this fashion. Furthermore, the CPSL does not expressly preclude civil liability for a failure to report abuse, nor immunize those who fail in their reporting obligations.

Consequently, for purposes of determining whether Appellants have stated a *prima facie* case of medical malpractice or negligence, we think it most useful to evaluate the adequacy of Appellants' showing in this regard as though the CPSL simply does not exist. Appellants claim not to rely upon it, and we find no reason in Pennsylvania law not to treat their asserted common-law claims as such. If Appellants' claims cannot stand without reference to the CPSL, our analysis would reveal that flaw. However, we do not find that to be the case.

### C. Appellants Have Set Forth a *Prima Facie* Case of Medical Malpractice.

We begin with the time-honored characterization of the standard that governs common-law medical malpractice claims:[6]

> [W]hen a plaintiff's medical malpractice claim sounds in negligence, the elements of the plaintiff's case are the same as those in ordinary negligence actions. As such, medical malpractice can be broadly defined as the unwarranted

---

[6] At times, Appellants refer to their claims as ordinary negligence and in others as sounding in medical malpractice. However, the substance of their claims consists of assertions consistent with medical malpractice, and we treat them exclusively as such. **See *Grossman v. Barke***, 868 A.2d 561, 566 (Pa. Super. 2005) (analyzing claims stated as ordinary negligence under the standards governing medical malpractice).

- 16 -

departure from generally accepted standards of medical practice resulting in injury to the patient, including all liability-producing conduct arising from the rendition of professional medical services. Thus, to prevail in a medical malpractice action, a plaintiff must establish a duty owed by the physician to the patient, a breach of that duty by the physician, that the breach was the proximate cause of the harm suffered, and [that] the damages suffered were a direct result of the harm.

*Toogood v. Owen J. Rogal, D.D.S., P.C.*, 824 A.2d 1140, 1145 (Pa. 2003) (citations and internal quotation marks omitted); *see Grossman v. Barke* , 868 A.2d 561, 566 (Pa. Super. 2005).

"Whether a duty of care exists in any given set of circumstances is a question of law." *Winschel v. Jain*, 925 A.2d 782, 796 (Pa. Super. 2007). However, provided the plaintiff makes a *prima facie* showing of a duty, the standard of care and the defendant's satisfaction of that standard are questions of fact to be submitted to a jury. *Joyce v. Blvd. Phys. Therapy & Rehab. Ctr., P.C.*, 694 A.2d 648, 654-55 (Pa. Super. 1997).

> **1. Appellees owed the general duty of care to K.H. that arises in the physician-patient relationship.**

Our Supreme Court has spoken eloquently of the nature of the duty owed by any one person to another:

In determining the existence of a duty of care, it must be remembered that the concept of duty amounts to no more than the sum total of those considerations of policy which led the law to say that the particular plaintiff is entitled to protection from the harm suffered. . . . To give it any greater mystique would unduly hamper our system of jurisprudence in adjusting to the changing times. The late Dean Prosser expressed this view as follows:

> These are shifting sands, and no fit foundation. There is a duty if the court says there is a duty; the law, like the Constitution, is what we make it. Duty is only a word with which we state our conclusion that there is or is not to be liability; it necessarily begs the essential question. When we find a duty, breach and damage, everything has been said. The word serves a useful purpose in directing attention to the obligation to be imposed upon the defendant, rather than the causal sequence of events; beyond that it serves none. In the decision whether or not there is a duty, many factors interplay: [t]he hand of history, our ideas of morals and justice, the convenience of administration of the rule, and our social ideas as to where the loss should fall. In the end the court will decide whether there is a duty on the basis of the mores of the community, always keeping in mind the fact that we endeavor to make a rule in each case that will be practical and in keeping with the general understanding of mankind.

> ***Sinn v. Burd***, 404 A.2d 672, 681 (Pa. 1979) (citations omitted).

***Althaus v. Cohen***, 756 A.2d 1166, 1169 (Pa. 2000) (emphasis added; citations modified); *see **Thierfelder v. Wolfert***, 52 A.3d 1251, 1265 (Pa. 2012).

The following overarching principle, which adapts the broader notion of duty to the context of medical malpractice, is enshrined in many decades of our case law:

> Duty is measured against the standard of care appropriate to the training of the physician and the time and place of the treatment. Our Supreme Court has explained the standard of care appropriate to a non-specialist physician as follows:

> > The standard of care required of a physician . . . is well-settled . . . . A physician who is not a specialist is required to possess and employ in the treatment of a patient the skill and knowledge usually possessed by physicians in the same or a similar locality, giving due regard to the advanced state of the profession at the time of the treatment; and in employing the required skill and

- 18 -

> knowledge he is also required to exercise the care and judgment of a reasonable man.
>
> ***Joyce***, 694 A.2d at 654 (quoting ***Donaldson v. Maffucci***, 156 A.2d 835, 838 (Pa. 1959))

***Winschel***, 925 A.2d at 796-97 (citations modified).

> A specialist acting within his or her specialty . . . is held to a higher standard; he or she is expected to exercise that degree of skill, learning and care normally possessed and exercised by the average physician who devotes special study and attention to the diagnosis and treatment of diseases within the specialty.

***Maurer v. Trustees of Univ. of Penna.***, 614 A.2d 754, 758

(Pa. Super. 1992) (internal quotation marks omitted).

The trial court began its discussion of Appellants' common-law claims

as follows:

> As a general rule, under Pennsylvania law, a person is not liable for the criminal conduct of a third party. ***Feld v. Merriam***, 485 A.2d 742, 756 (Pa. 1984). Moreover, it is axiomatic that there is no duty to control the conduct of a third person to prevent him from causing physical harm to another unless (a) a special relationship exists between the actor and third person's conduct, or (b) a special relationship exists between the actor and the other which gives the other a right to protection. ***Emerich v. Phila. Ctr. for Human Dev., Inc.***, 720 A.2d 1032, 1036 (Pa. 1998). . . . Absent a special relationship, the duty that one person owes to another is "the general duty imposed upon all persons not to expose others to risk of injury which are reasonably foreseeable[."] ***Schmoyer v. Mexico Forge, Inc.***, 649 A.2d 705, 708 (Pa. Super. 1994).

T.C.O. at 18 (citations modified).

The trial court relied exclusively upon a Georgia decision to support its

finding that no relevant duty arose under the circumstances of this case.

- 19 -

Specifically, the trial court deemed "persuasive" the Court of Appeals of Georgia's decision in **Cechman v. Travis**, in which that court, faced with claims materially identical to those at bar, found no common-law duty on the part of the physician to discover and report a case of possible child abuse. T.C.O. at 19 (citing **Cechman**, 414 S.E.2d 282, 285 (Ga. Ct. App. 1991)). **But see First Comm'l Trust Co. v. Rank**, 915 S.W.2d 262, 267-68 (Ark. 1996) (rejecting **Cechman** and noting that physician's attorney conceded that common-law medical malpractice claim may lie for failure to report).

We find the trial court's resort to **Cechman** unconvincing. In connection with duty, we are confronted with a trial court decision and arguments by the Appellees reflecting an essential misapprehension by the trial court and the Appellees, one that perhaps descends from many cases in which the distinction between duty and standard of care has been blurred without consequence when properly separating the two was less critical than it is in this case. Stated specifically and in brief, the trial court and Appellees effectively maintain that the question of duty must be stated in the particular terms of the case presented. Thus, in the absence of an express common-law "duty" specifically to report suspected child abuse that has been recited in a prior controlling precedent, such a claim categorically is unavailable. However, to define the relevant duty in this case in that fashion improperly imports into the duty inquiry questions pertaining to whether a

duty was **breached**, which is a question of fact as to which Appellants presented sufficient evidence to create a genuine issue of material fact.

In most cases, this distinction will be of little import, which is why our medical malpractice case law tends to lack discussions that clearly segregate these inquiries. However, disentangling these principles is critical to resolving the issue presented: If the question is simply whether Appellees owed K.H., as their patient, a duty of reasonable care, then the necessity of a duty clearly is satisfied. As our case law makes clear, a physician must "possess and employ in the treatment of a patient the skill and knowledge usually possessed by physicians in the same or a similar locality, giving due regard to the advanced state of the profession at the time of the treatment" and "is also required to exercise the care and judgment of a reasonable man." *Winschel*, 925 A.2d at 196-97. However, if, as the trial court and Appellees maintain, the question is whether Appellees had a specific duty to report suspicions of abuse, the absence of case law establishing such a duty lends at least some credence to Appellees' claims that to vindicate Appellants' view would create an entirely new form of liability, which this Court does not regularly do.[7]

_____

[7] Although ultimately we find this argument immaterial to our analysis, the mere recognition of a viable basis for a tort claim that has not previously been presented to Pennsylvania courts should not be fatal *per se* to such a claim. As the Minnesota Supreme Court observed in *Becker v. Mayo Foundation*, 737 N.W.2d 200 (Minn. 2007), the "[n]ovelty of an asserted right and lack of common-law precedent are no reasons for denying its

*(Footnote Continued Next Page)*

Although we find the relevant principle in the above-cited cases, Pennsylvania law is not a paragon of clarity in distinguishing duty from standard of care. Nonetheless, additional suggestions as to the correct answer are found in the above cases and others. In **Pratt v. Stein**, 444 A.2d 674 (Pa. Super. 1982), for example, we held that a physician's duty to a patient is simply the "exercise [of] reasonable medical care," without importing into that question of duty the precise contours of what care was appropriate under the circumstances of that case. Rather, we addressed the particular standard of care and the doctor's satisfaction thereof as a question of fact. **Id.** at 705. And in **Ervin v. American Guardian Life Assurance Co.**, 545 A.2d 354 (Pa. Super. 1988), this Court held that a cardiologist retained by an insurance company to review an insured's electrocardiogram did not owe the claimant a duty that would support a medical malpractice action. In so doing, we favorably quoted a Michigan decision to the effect that, where the claimant did not seek medical advice or treatment from the defendant, the physician lacked the duty that attaches to such a relationship. **Id.** at 356 (quoting **Rogers v. Horvath**, 237 N.W.2d 595, 596-97 (Mich. Ct. App. 1976)).[8]

_(Footnote Continued)_ ───────────

existence. The common law does not consist of absolute, fixed, and inflexible rules. Its principles have been determined by the social needs of the community and have changed with changes in such needs." **Id.** at 216.

[8] The Michigan Supreme Court later abrogated **Rogers**, holding that an independent medical examiner owes a limited duty to the subject of his

_(Footnote Continued Next Page)_

Perhaps most interestingly, just last year this Court reaffirmed a limited duty on the part of a physician to certain third parties in the treatment of a patient with a communicable disease. Our decision was couched in the Restatement (Second) of Torts § 324A ("Liability to Third Person for Negligent Performance of Undertaking"), which provides that "[o]ne who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person . . ., is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care . . . ." Restatement (Second) of Torts § 324A. We noted that the "original undertaking," *i.e.*, "entry into the physician-patient relationship for treatment purposes," imposed upon the physician "the duty to exercise reasonable care." **Matharu v. Muir**, 86 A.3d 250, 259 (Pa. Super. 2014) (quoting **Seebold v. Prison Health Servs., Inc.**, 57 A.3d 1232, 1244-45 (Pa. 2012)).

Comparing these cases' accounts of what general duty a physician owes to a patient to certain intrinsic principles of medical malpractice claims points to the proper approach to separating a physician's duty from his standard of care. First, as noted, *supra*, the duty inquiry is a pure question of law. Consequently, it is for the court in the first instance to determine without jury consideration whether a duty attaches under the circumstances

*(Footnote Continued)* ───────────

examination that is consistent with his professional training and expertise. **See Dyer v. Trachtman**, 679 N.W.2d 311 (Mich. 2004).

- 23 -

of the case before it. However, we also have made clear that in all but extraordinary cases, establishing the applicable standard of care, or if one prefers, the **contours** of the general duty recognized in the first instance by the court, requires expert testimony and presents a question of fact for the jury. *Joyce*, 694 A.2d at 654-55. If we allow the trial court to import into the duty inquiry a determination as to the precise standard of care at issue, and implicitly to decide on summary judgment that the standard has not been breached, we take from the jury its prescribed role in medical malpractice cases. The integrity of the time-honored delineation of what belongs to the court and what belongs to the jury can be preserved only by separating a physician's **general** duty to his patient, the formulation of which arises simply from the inception of any physician-patient relationship, from the elucidation of how that duty is to be fulfilled in a given case, which concerns the particular standard of care, and whether the defendant did so. The latter inquiries require a jury determination. *See id.*[9]

_____

[9] Even as they argue for the expanded account of what duty a trial court must find as a matter of law before a case may proceed, Appellees LGH and Dr. Kumar elsewhere appear to concede that the inquiry properly proceeds from the threshold question of law on to trial and jury consideration as we explain herein. LGH, for example, notes that "a duty exists, as recognized by law as created by the physician/patient relationship, that requires the physician to act in accordance with specific norms or standards **established by the profession**, commonly referred to as the standard of care." Brief for LGH at 20 (emphasis in original). LGH then notes that, "if no care is due, it is meaningless to assert that a person failed to act with due care." *Id.* (quoting *Elbasher v. Simco Sales Serv. of Penna.*, 657 A.2d 983, 984-85 (Pa. Super. 1995)). *See* Brief for Kumar at 36-37 (noting that "[w]hether a

*(Footnote Continued Next Page)*

In light of this account, it is clear that the trial court conflated the broader inquiry into Appellees' duties into one inflected by the case- and physician-specific standard of care, the determination of which is reserved for the jury. This error led the court to conclude that no common-law claim for a failure to report would lie, when, in fact, the common-law claim that was asserted is (or may be) merely a species of medical malpractice, albeit one infrequently invoked, requiring expert testimony sufficient to enable a jury to conclude that the standard of care applicable to Appellees in this case entailed an obligation to report suspicions of child abuse. Appellants established Appellees' general duty as soon as they established the undisputed physician-patient relationship between K.H. and all of the Appellees in this case. Thus, we now must consider whether Appellants set forth sufficient evidence as to each of the remaining elements of a medical malpractice claim to establish a *prima facie* case for medical malpractice.

### 2. Appellants set forth a *prima facie* case that Appellees breached their respective duties to K.H.

Having established the threshold duty that K.H.'s healthcare providers owed him as a consequence of the physician-patient relationship, we turn

---

*(Footnote Continued)*

physician is performing his duty . . . is established by the profession of which the physician is a member," but stating that "[e]xperts do not establish whether a duty exists," and conceding that Dr. Kumar had a duty to examine, diagnose, and treat K.H.).

now to the question of breach. Because we review Appellants' proffer in the light most favorable to Appellants, we must consider whether their evidence (a) could lead a jury reasonably to conclude that Appellees' standards of care entailed obligations to form and/or report suspicions of abuse, and (b) establishes a basis upon which a jury reasonably could conclude that Appellants failed to meet their respective standards of care.

**(a) Appellants' evidence creates a genuine issue of material fact regarding whether Appellees' standard of care imposed upon them a reporting obligation.**

Under the circumstances of this case, establishing the applicable standard of care for a general practitioner or a specialist generally requires expert testimony. **See Donaldson**, 156 A.2d at 838; **Maurer**, 614 A.2d at 758. Typically, "[a] plaintiff [must] present an expert witness who will testify, to a reasonable degree of medical certainty, that the acts of the physician deviated from good and acceptable medical standards . . . ." **Mitzelfelt v. Kamrin**, 584 A.2d 888, 892 (Pa. 1990).

> "This requirement stems from judicial concern that, absent the guidance of an expert, jurors are unable to determine relationships among scientific factual circumstances." **Brannan v. Lankenau Hosp.**, 417 A.2d 196, 199-200 (Pa. 1980) (citing **McMahon v. Young**, 276 A.2d 534 (Pa. 1971)). The standard by which an expert witness is qualified, however, is a liberal one. **Lira v. Albert Einstein Med. Ctrs.**, 559 A.2d 550 (Pa. Super. 1989); **see Flanagan v. Labe**, 666 A.2d 333, 335 (Pa. Super. 1995) (nurse properly testified to standard of care pertaining to certain acts where she had in fact performed those acts). "If a witness has any reasonable pretension to specialized knowledge on the subject under investigation he may testify, and the weight to be given to his [testimony] is for the jury."

- 26 -

> *Lira*, 559 A.2d at 552 (quoting *Kuisis v. Baldwin-Lima-Hamilton Corp.*, 319 A.2d 914, 924 (Pa. 1974)).

*Joyce*, 694 A.2d at 654-55 (citations modified); *see Toogood*, 824 A.2d at 1149 ("[A] jury of laypersons generally lacks the knowledge to determine the factual issues of medical causation; the degree of skill, knowledge, and experience required of the physician; and the breach of the medical standard of care."[10]).[11]

Conspicuously absent from this appeal is any suggestion by Appellees that the numerous experts who have provided their opinions in this case on Appellants' behalf are unqualified as such to speak on the subjects upon which they opine, and their respective credentials would militate strongly against any such challenge. Consequently, the only question is whether Appellants provided expert evidence that defined a standard of care requiring reporting to a reasonable degree of medical certainty and asserted a breach thereof with respect to each Appellee. Appellants provided voluminous evidence to precisely that effect.

---

[10] Here, too, it is clear that determining the standard of care is a task firmly ensconced with the jury, not the court under the guise of satisfying the threshold question of whether the defendant owed a duty to the plaintiff.

[11] With the enactment of Pennsylvania's Medical Care Availability and Reduction of Error Act ("MCARE"), 40 P.S. §§ 1303.101, *et seq.*, additional mandatory qualifying criteria were imposed upon the introduction of such expert testimony. Because the parties to this matter do not dispute the qualifications of Appellants' experts, the MCARE restrictions, which merely reinforce and give shape to the common-law expert testimony requirement that preceded MCARE's May 20, 2002 effective date, are not at issue.

Eli H. Newberger, M.D., a board-certified pediatrician, Assistant Professor of Pediatrics at Harvard Medical School, and Adjunct in Pediatrics at Childen's Hospital of Boston, rendered a lengthy report that touched upon the standard of care governing Appellees, reviewed at length the medical history and records documenting Appellees' treatment of K.H., and expressly rendered his opinions as to the standard of care and each physician's individual failures to satisfy that standard "to a reasonabl[e] degree of medical certainty." Report of Eli H. Newberger, M.D., 7/8/2013, at 2, 23, attached as Exh. FF to Appellants' Omnibus Memorandum of Law In Opposition to All Defendants' Motion for Summary Judgment ("Appellants' Omnibus Memorandum"), 9/27/2013 (hereinafter "Newberger Report").

Dr. Newberger's account of the standard of care was as follows:

As a matter of background, Pennsylvania's child reporting statute was harmonized with the model developed by the American Bar Association commission on which I served in the mid-1970's. Pursuant to the 1973 Federal Child Abuse Prevention and Treatment Act, prior to their receiving their monetary shares of the Congressional budgetary allocation for the National Child Abuse Center in the Department of Health, Education, and Welfare, states were required to conform their reporting standards to the Federal model. The threshold for reporting—reasonable cause or suspicion—was intentionally set low in order to assure that children would be protected from subsequent, more severe injuries than those initially reported. Infant injuries and their frequently fatal or lasting consequences were a particular focus of concern, and a national training initiative assured that the reporting requirements and their rationale were built into the training of medical students, primary care physicians, and especially, pediatricians. Thus, **the standard of care for physicians in recognition and reporting of child abuse has been incorporated into the reporting statutes.**

Newberger Report at 2 (emphasis added).[12]

Similarly, David Turkewitz, M.D., a board-certified pediatrician and, *inter alia*, Chairman of Pediatrics at York Hospital in York, Pennsylvania, Director of Section Pediatric Emergency Medicine of the Department of Emergency Medicine,[13] and clinical professor of pediatrics at Pennsylvania State University, averred that, "[i]n order to comply with the standard of care a physician, particular[ly] a pediatrician, must appropriately recognize signs and symptoms of abuse, diagnose that abuse, and report that abuse." Report of David Turkewitz, M.D., undated, at 2, attached as Exh. HH to Appellants' Omnibus Memorandum (hereinafter "Turkewitz Report"). Dr. Turkewitz elaborated as follows:

> [T]he obligation to report a suspicion of child abuse **is the standard of care governing any physician.** This duty is **also** mandated by statute in Pennsylvania (and elsewhere). A

---

[12] The language emphasized in this passage and those that immediately follow is important because, as worded, it suggests that the standard of care existed separately from, and was later baked into, the model law upon which the CPSL is founded, not that the statute supplied or supplanted the standard of care. Moreover, no authority of which we are aware suggests that, when a statute overlaps or is in conformity with a common-law standard of care, or vice-versa, that standard of care no longer governs the physician's conduct independently of the statute. Even when they entirely overlap, the different standards of proof governing criminal and civil claims for failure to report suggest otherwise: Under medical malpractice, a plaintiff need only establish a negligent breach of the standard of care by a preponderance of the evidence, while criminal liability, even for the same alleged conduct, requires proof beyond a reasonable doubt of a "willful" failure to report.

[13] This title is per Dr. Turkewitz's *curriculum vitae*.

reasonable suspicion of abuse is exactly that: if after analysis of decision[-]making components, there is a reasonable suspicion of abuse, then the physician has a duty to report under Pennsylvania mandating reporting requirements **which is encompassed in the standard of care**. Reasonable suspicion by no means requires a high degree of medical certainty. The threshold for reporting is purposely set low to encourage reporting of child abuse and to ensure children are protected from additional abuse which can lead to further injury or death. The goal is simple—protection of the child. . . . All physicians, **in accordance with the standard of care**, must therefore appropriately appreciate, assess, diagnose, and report signs and symptoms of abuse.

*Id.* at 3 (emphasis added).[14]

In light of this expert evidence, it would be untenable to suggest that Appellants failed to adduce sufficient evidence to create a genuine issue of material fact regarding whether Appellees' standard of care obligated them to report reasonable suspicions of child abuse to the appropriate authorities, independently of a similar statutory obligation.

**(b) Appellants' evidence raises a genuine issue of material fact regarding whether Appellees breached the governing standard of care.**

We now move on to review Appellants' experts' opinions regarding each Appellee-physician's performance under the standard of care.

_____

[14] Without exception, the other experts cited below, who are cited, *infra*, as attesting that one or more Appellees breached the standard of care, similarly aver that the standard of care imposes a reporting obligation independently of the statute requiring same. To cite them all would gild the lily.

### *Shakthi Kumar, M.D.*

With respect to Dr. Kumar, Dr. Newberger opined as follows:

[Dr. Kumar] failed multiple times to make mandated reports of suspected abuse.  While she should have reported on September 12, 2002, each new injury thereafter provided even more reason to report, and her failure to act in accordance with the standard of care in assessment, diagnosis, and reporting of child abuse served not only to deny this child the protection that he needed and deserved, but enabled his abuser to continue to harm him.  Dr. Kumar was at the core of over three months of escalating injuries to [K.H.] that were all suspicious of [*sic*] an ongoing pattern of abuse to the child, as well as concerns by several other physicians for abuse.  Despite this, Dr. Kumar did nothing to protect the child from further abuse and actually defended against allegations of abuse by other physicians.  This was a gross deviation from the standard of care that had catastrophic consequences of additional and more severe abuse that rendered [K.H.] neurologically devastated.

Newberger Report at 22; ***see*** Report of Herschel R. Lessin, M.D., 7/8/2013, at 12, attached as Exh. LL to Appellant's Omnibus Memorandum; Report of Maria McColgan, M.D., 7/8/2013, attached as Exh. JJ to Appellants' Omnibus Memorandum (hereinafter "McColgan Report"); Turkewitz Report.

### *Yvonne Siwek, M.D.*

With respect to Dr. Siwek, Dr. Newberger opined as follows:

[Dr. Siwek], Dr. Kumar's colleague at Lancaster Pediatrics, failed to report abuse, notwithstanding having written ABUSE in capital letters on the form in which she documented her visit with the infant at 2 months of age.  She saw evidence of unexplained fractures that were highly concerning for abuse and failed to report her suspicions of abuse.

Newberger Report at 22; *see* Report of Dan Cohen, M.D., 7/8/2013, attached as Exh. NN to Appellant's Omnibus Motion; McColgan Report; Turkewitz Report.

### Donald D. Diverio, Jr., D.O.

With respect to Dr. Diverio, Dr. Newberger opined as follows:

[Dr. Diverio], according to his own account, despite being informed that the "parents are being investigated for child abuse" failed to connect the infant's pain responses over the rib cage and on being turned to the prone position with his multiple underlying rib fractures, nor to consider the vectors of force that would produce rib fractures (violent squeezing of the thorax) and vertebral compressions (vertical forces from being bounced).  He failed to explore with appropriate additional diagnostic studies whether there were other signs of osseous trauma.  In addition to failing to properly diagnose abuse in this child, he also failed to make a mandated report of suspected abuse.  The contemporaneous records of Dr. Kumar and testimony of others indicated that Dr. Diverio made allegations of abuse to the family, yet he failed to comply with the standard of care in reporting his suspicions of abuse.

Newberger Report at 22-23; *see* Report of Mininder S. Kocher, M.D., 7/8/2013, attached as Exh. PP to Appellant's Omnibus Memorandum; Turkewitz Report.

### Julie A. Mack, M.D.

With respect to Dr. Mack, Dr. Newberger opined as follows:

[Dr. Mack] missed important findings on several radiology studies and failed to pursue with appropriate radiographs her diagnosis of multiple rib fractures and appeared to advocate for a benign interpretation of worrisome findings that confused medical colleagues[,] and[] her actions were a key reason why the child's abuse continued to its ultimate tragic ending.  She violated both [LGH's] policies on child abuse and the

Pennsylvania mandate to report suspected abuse under the standard of care and state law.

*Id.* at 23; *see* Report of Alan E. Oestreich, M.D., 7/6/2013, attached as Exh. TT to Appellants' Omnibus Memorandum; Turkewitz Report.

### Gene C. Smigocki, M.D.

With respect to Dr. Smigocki, Dr. Newberger opined as follows:

[Dr. Smigocki] failed to appropriately interpret and report abnormal findings in a 12/6/06 head ultrasound that were indicative of abusive head trauma and would have resulted in a heightened concern for abuse to this child by the clinicians and reporting, especially in light of the plethora of other injuries preceding the ultrasound.

*Id.*; *see* Report of James J. Abrahams, M.D., 7/8/2013, attached as Exh. VV to Appellants' Omnibus Memorandum; Turkewitz Report.

### Atilla G. Devenyi, M.D.

With respect to Dr. Devenyi, Dr. Newberger opined as follows:

[Dr. Devenyi] documented a hemorrhagic rash/bruise that covered the skin from the sternum to the lateral chest wall. Notwithstanding his explicit concern about the risk of inflicted injury, documented in the records of Dr. Kumar and manifested in his ordering both a skeletal x-ray survey and clotting studies, he improperly acquiesced with Dr. Kumar in cancelling those studies. Moreover, after his examination and discussion with Dr. Kumar, Dr. Devenyi failed to make a mandated report of suspected abuse.

*Id.*; *see* Report of Fredric Daum, M.D., 7/8/2013, attached as Exh. RR to Appellants' Omnibus Memorandum; Turkewitz Report.

More than enough expert testimony was presented by Appellants to create a genuine issue of material fact regarding the nature of the relevant

general and specialist standards of care, independently of the CPSL, as well as whether each Appellee conformed to those that applied to him or her or breached the standard, and, in so doing, his or her duty to K.H.[15] Accordingly, we turn to Appellants' evidence in support of damages and causation.

### 3. Appellants have provided ample evidence to raise a jury question with respect to damages.

Because the adequacy of Appellants' proffered expert evidence regarding the nature and scope of Appellants' damages has not been challenged on appeal, it is not necessary to address this issue at length. In the interests of comprehensiveness, we simply note that Appellants

---

[15] Appellees make much of the proposition that they had no duty to third parties, or to control third parties. However, it is clearly the case that the duty asserted by Appellants was Appellees' duty to K.H., which, at least in its broadest strokes, cannot be disputed. Appellees also argue at length that their duty extends **only** to diagnosis and treatment, and does not reach any obligation to report, a proposition flatly contradicted by several of Appellants' experts. *See, e.g.*, Brief for Smigocki at 31-33. Moreover, other cases, albeit distinguishable in various particulars, have established that a physician's duty to a patient or, in certain narrow circumstances, to a third party, may reach outside the examination room. *See Emerich*, 720 A.2d 1032 (holding that a mental health professional has a duty to warn a third party of a patient's threat to harm the third party); *DiMarco v.Lynch Homes—Chester County, Inc.*, 583 A.2d 422 (Pa. 1990) (permitting suit against physician by a third party who contracts a communicable disease when third party establishes that he contracted disease due to physician's erroneous advice to patient). Thus, it is clear that the precise scope of a physician's duty to a patient (and to others) is more complex than any of Appellees' arguments would allow, and can be extended to matters affecting the public interest that fall outside the narrow bounds of diagnosis and treatment of the maladies presented by a given patient.

furnished several reports from qualified experts attesting in detail to the necessities of K.H.'s ongoing care, K.H.'s medical prognosis, and the costs Appellants will incur in attending to his needs. *See* Report of David L. Hopkins, 7/8/2013, attached as Exh. III to Appellant's Omnibus Memorandum (actuarial cost estimate); Report of B.A. McGettigan, R.N., 7/7/2013, attached as Exh. GGG to Appellants' Omnibus Memorandum (home care analysis and cost estimate); Reports of Thomas Rugino, M.D., 12/8/2012, 7/6/2013, and 7/8/2013, Attached respectively as Exhs. XX, YY, and ZZ to Appellants' Omnibus Memorandum (medical analysis and prognosis).

4. **Appellants' evidence raises a genuine issue of material fact regarding whether Appellees' alleged breach of their respective standards of care caused K.H.'s damages.**

We now examine whether Appellants provided a *prima facie* showing that Appellees' alleged breaches of the applicable standards of care caused K.H.'s injuries. The trial court did not believe so, reasoning as follows:

> [E]ven if [Appellees] owed a duty to [K.H.] to report a reasonable suspicion that he was a victim of abuse, under the circumstances of this case there is insufficient evidence of causation for [Appellants'] negligence claims to proceed. In a medical malpractice suit for negligence, the expert testimony requirement "means that a plaintiff must present medical expert testimony to establish that the care and treatment of the plaintiff by the defendant fell short of the required standards of care and that the breach proximately caused the plaintiff's injury." ***Toogood***, 824 A.2d at 1145. . . . An expert may not base his opinion regarding causation on mere speculation or conjecture. Instead,

> [w]hen a party must prove causation through expert testimony[,] the expert must testify with "reasonable certainty" that "in his professional opinion, the result in question did come from the cause alleged[."] An expert fails this standard of certainty if he testifies that the alleged cause "possibly[,]" or "could have" led to the result, that it "could very properly account" for the result, or even that it was "very highly probable" that it caused the result.
>
> ***Kovach v. Cent. Trucking, Inc.***, 808 A.2d 958, 959-60 (Pa. Super. 2002) (citing ***Cohen v. Albert Einstein Med. Ctr., N. Div.***, 592 A.2d 720, 723-24 (Pa. Super. 1991)).
>
> In the case at bar, [Appellants] cannot establish to a reasonable degree of medical certainty that [Appellees'] failure to report their alleged suspicions that [K.H.] was a victim of child abuse caused his injuries on December 18, 2002. [K.H.] was not injured as a result of any of the treatment he was given by [Appellees]. Rather, [Appellants] allege that [Appellees] were negligent merely for failing to discover and report the non-medical source of [K.H.'s] condition. Even if [Appellees] had reported a suspicion of child abuse to the appropriate authorities, there is no way to prove that Lancaster County Children and Youth Services would have definitely intervened and removed [K.H.] from his home. Suggesting that [Appellees'] failure to report the abuse "could very [probably]" account for [K.H.'s] injuries is insufficient as a matter of law. [Appellants] are required to demonstrate to a reasonable degree of medical certainty that [Appellees] caused [K.H.'s] injuries, which they are unable to do in this case without engaging in speculation and conjecture.

T.C.O. at 20-21 (citations modified).

The trial court's recitation of the standard is incomplete, because it wholly neglects to acknowledge, and arguably contravenes, Pennsylvania case law recognizing the relaxed burden of proof reserved for cases in which it would be unreasonable and inequitable to demand that a plaintiff provide

conclusive evidence that the defendant is the direct and exclusive cause of

the harm alleged. This Court has explained as follows:

> In **Hamil v. Bashline**, our Supreme Court adopted the relaxed "increased-risk-of-harm" standard for use in certain medical malpractice claims. 392 A.2d 1280, 1288 (Pa. 1978). In adopting this principle, the **Hamil** Court reasoned:
>
> > In light of our interpretation of [subs]ection 323(a),[16] it follows that where medical causation is a factor in a case coming within that Section,[17] it is not necessary that the plaintiff introduce medical evidence in addition to that already adduced to prove defendant's conduct increased the risk of harm—to establish that the negligence asserted resulted in plaintiff's injury. Rather, once the jury is apprised of the likelihood that defendant's conduct resulted in plaintiff's harm, [subsection 323(a)] leaves to the jury, and not the medical expert, the task of balancing probabilities.
>
> **Hamil**, 392 A.2d at 1288. Subsequently, our high court explained:

_____

[16] **Negligent Performance of Undertaking to Render Services**

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm . . . .

Restatement (Second) of Torts § 323(a).

[17] We have held that subsection 323(a) applies, _inter alia_, to failure-to-diagnose cases. **See Jones v. Montefiore Hosp.,** 431 A.2d 920, 925 (Pa. 1981) (citing **Gradel v. Inouye**, 421 A.2d 674 (Pa. 1980)). We can conceive of no reason why it would not apply in this case, which involves both failure-to-diagnose **and** failure-to-report claims.

> An example of this type of case is a failure of a physician to timely diagnose breast cancer. Although timely detection of breast cancer may well reduce the likelihood that the patient will have a terminal result, even with timely detection and optimal treatment, a certain percentage of patients unfortunately will succumb to the disease. This statistical factor, however, does not preclude a plaintiff from prevailing in a lawsuit. Rather, once there is testimony that there was a failure to detect the cancer in a timely fashion, and such failure increased the risk that the woman would have either a shortened life expectancy or suffered harm, then it is a question for the jury whether they believe, by a preponderance of the evidence, that the acts or omissions of the physician were a substantial factor in bringing about the harm. ***See Jones v. Montefiore Hosp.***, 431 A.2d 920 (Pa. 1981).

*Mitzelfelt*, 584 A.2d at 892; ***see Smith v. Grab***, 705 A.2d 894, 899 (Pa. Super. 1997) (stating expert's testimony demonstrating increased risk of harm "furnishes a basis for the fact-finder to go further and find that such increased risk of harm was in turn a substantial factor in bringing about the resultant harm") (quoting ***Hamil***, *supra*).

Accordingly, in cases where the plaintiff has introduced sufficient evidence that the defendant's conduct increased the risk of injury, the defendant will not avoid liability merely because the plaintiff's medical expert was unable to testify with certainty that the defendant's conduct *caused* the actual harm. ***Montgomery v. S. Phila. Med. Grp., Inc.***, 656 A.2d 1385, 1392 (Pa. Super. 1995) (citing ***Mitzelfelt***, *supra*). The trial court may send the issue of causation to the jury "upon a less than normal threshold of proof" as long as reasonable minds could conclude that a preponderance of the evidence shows the defendant's conduct was a *substantial factor in causing* the resulting harm. ***Id.*** The determination then rests with the jury. ***Mitzelfelt***, *supra*; ***Montgomery***, *supra* at 1391 (citing ***Jones***, *supra*).

***Carrozza v. Greenbaum***, 866 A.2d 369, 380-81 (Pa. Super. 2004), *aff'd on other grounds*, 916 A.2d 553 (Pa. 2007) (footnote omitted; citations modified; all emphasis as rendered in ***Carrozza***); ***see Vogelsberger v.***

*Magee-Womens Hosp. of UPMC Health Sys.*, 903 A.2d 540, 563-64 (Pa. Super. 2006) ("Once there is sufficient testimony to establish that (1) the [health care provider] failed to exercise reasonable care, that (2) such failure increased the risk of physical harm to the plaintiff, and (3) such harm did in fact occur, then it is a question properly left to the jury to decide whether the acts or omissions were the proximate cause of the injury. The jury, not the medical expert, then has the duty to balance probabilities and decide whether defendant's negligence was a substantial factor in bringing about the harm.").

In reliance upon *Hamil* and other decisions, this Court further has held that "[a] defendant cannot escape liability because there was a statistical possibility that the harm could have resulted without negligence." *Montgomery v. S. Phila. Med. Grp., Inc.*, 656 A.2d 1385, 1392 (Pa. Super. 1995). The concurrence of a contributing cause with the negligence at issue in a given case "does not relieve the defendant from liability unless he can show that such other cause would have produced the injury independently of his negligence." *Id.* (internal quotation marks omitted); *accord Kearns v. Clark*, 493 A.2d 1358, 1361 (Pa. Super. 1985); *Brozana v. Flanigan*, 454 A.2d 1125, 1128 (Pa. Super. 1983) (approving jury charge that informed the jury that it could find liability if the defendant's negligence "either was a substantial factor in bringing about the loss of appellant's leg or increased the risk of losing the leg and that increased risk was a substantial factor in the loss of the leg").

Several of Appellants' experts in this case have opined to a reasonable degree of medical certainty, and without obvious resort to pure conjecture, that Appellees' alleged breaches of their standards of care over a period of approximately three months substantially increased K.H.'s risk of harm.[18] Moreover, we have the highly detailed account provided by Larry Breitenstein, Ph.D., an expert with extensive credentials in social work focusing upon child abuse and child neglect, who, in preparing his doctoral

_____

[18] ***See, e.g.***, Newberger Report at 15 ("Dr. Kumar's and Dr. Siwek's deviations from the standard of care in assessment, diagnoses, and reporting of child abuse on September 12, 2002, increased the risk of harm of further abuse to [K.H.] and were a substantial contributing factor in him suffering a permanent and catastrophic brain injury."), 16 ("Dr. Mack's and Dr. Kumar's conduct in connection with the 9/12/02 skeletal survey deviated from the standard of care, increased the risk of harm to K.H., and was a substantial contributing factor to K.H. suffering further abuse [that] resulted in a severe and irreversible brain injury."), 17 ("Dr. Devenyi's failure to report his suspicion of abuse on October 2, 2002 or anytime thereafter was a deviation in the standard of care that increased the risk of harm to [K.H.] and was a substantial contributing factor to him suffering further abuse and a permanent brain injury."), 21 ("[D]ue to the missed interpretation of the ultrasound by Dr. Smigocki, [K.H.] was denied one final opportunity to avoid the continued abuse that culminated in the permanent brain injury . . . ."), 22-23 (noting that Dr. Diverio failed to comply with the standard of care in reporting his suspicions of abuse, and opining that "[a]ll of the aforementioned deviations in the standard of care by [K.H.'s] providers in the diagnosis of child abuse and the failure to report suspicions of abuse increased the risk of harm and were substantial contributing factors in [K.H.'s] enduring further and more severe abuse and increased the risk of harm of him suffering an abusive head injury, which he went on to suffer"; adding that, "[h]ad abuse been appropriately diagnosed and reported by any of [Appellees] at any time prior to December 18, 2002[,] an appropriate investigation of the abuse would have occurred and [K.H.] would have been in a safe environment [free] from any further abusive trauma").

dissertation, examined "nearly two hundred thousand Pennsylvania child abuse and neglect reports," and who served for fifteen years as director of Westmoreland County's Children's Bureau, handling reports of abuse like those not made in this case between September and December of 2002. *See* Report of Larry Breitenstein, Ph.D., 7/8/2013, at 1, attached as Exh. EEE to Appellants' Omnibus Memorandum (hereinafter "Breitenstein Report"). Highlights of Dr. Breitenstein's report include his opinion, "based on [his] training, expertise and knowledge handling child abuse cases, [that] the obvious signs and symptoms of child abuse to [K.H.] that were missed by this child's physicians . . . [were] as troublesome as [he has] seen in [his] career." *Id.* at 2. In a detailed account of the procedures prescribed for children and youth agencies who receive a report of abuse featuring symptoms such as those at issue in this case even as early as September 9, 2002, Dr. Breitenstein opined that an investigation would have been conducted within twenty-four hours of the report; the case would have been designated "high risk" in light of K.H.'s age and the nature of his injuries; and the investigation would have "involved immediately going to the location of the child." *Id.* at 4. Because the suspected abuse involved "serious physical injury," Dr. Breitenstein indicated, the children and youth agency "would also have notified the District Attorney," and "a detective or other law enforcement officer designated by the county district attorney would have collaborated with [Children and Youth Services ("CYS")] and been involved with the interviews and the investigation." *Id.* Moreover, "[g]iven

that the parents were the primary persons that cared for the child, their interviews would have been extensive and comprehensive to determine if they were the abuser [*sic*]." *Id.* at 5.

Dr. Breitenstein's lengthy report addressed directly why it was his expert opinion, to a reasonable degree of professional certainty, that K.H.'s catastrophic brain injury would have been prevented had an appropriate report been made by one or more of K.H.'s physicians between September and December 2002:

> The [CPSL] provides remedies to protect children even if the perpetrator is unknown. The CPSL provides that the child may be taken into custody pursuant to a court order or by a law enforcement officer or duly authorized court officer if there are reasonable grounds to believe that the child is suffering from illness or injury or is in imminent danger from his surroundings and his removal is necessary. From September 9, 2002 until December 18, 2002, [K.H.] suffered from severe injuries (rib fractures, vertebral compressions, rapid increase in head size, as well as bruising and scratches) and given his age and vulnerability to future abuse he would certainly be considered to be in imminent danger. Therefore, either the investigating officer or detective **would have taken protective custody or the CYS worker would have sought a court order for protective custody if the perpetrator was unknown and/or had not been arrested**.

*Id.* at 5 (emphasis added). Given Dr. Breitenstein's credentials, experience, and the detail and certainty with which he asserted his conclusions regarding causation, the trial court's conclusion that, "[e]ven if [Appellees] had reported a suspicion of child abuse to the appropriate authorities, there is no way to prove that [CYS] would have definitely intervened," T.C.O. at 21, appears to us to be a patent usurpation upon the sort of determination of

fact that belongs with a jury. Dr. Breitenstein outlined what he characterized as **mandatory** protocols observed by children and youth agencies in every county in Pennsylvania that essentially guaranteed **some** significant degree of intervention upon a report of K.H.'s symptoms.[19]

_____

[19] Appellees, Dr. Kumar in particular, attempt to cast Dr. Breitenstein's testimony as wholly conjectural, opining that he cannot presume to know how CYS would have responded to a report under these circumstances. The strongest rebuttal of this argument is Dr. Breitenstein's report, which not only outlines his extensive experience in responding to these requests, but also outlines **mandatory** events that would follow a report of this nature as well as testifying with a reasonable degree of professional certainty that proper reports in this case would have resulted in a heightened degree of scrutiny, and a more rapid response, then reports of lesser harm. Furthermore, Dr. Kumar's resort to **Kovach v. Central Trucking, Inc.**, 808 A.2d 958 (Pa. Super. 2002), for the proposition that "no matter how skilled or experienced the expert witness may be, he will not be permitted to guess or to state a judgment based on mere conjecture," does her argument no favors, given our ruling in that case. **See** Brief for Kumar at 32 (quoting **Kovach**, 808 A.2d at 959). In **Kovach**, we reversed a trial court ruling excluding a physician-expert's testimony upon the basis that it was speculative. Specifically, we determined that the trial court should not have excluded the expert's testimony regarding whether the accident sued-upon resulted in the plaintiff's knee injuries, even though the expert admitted that he could not be certain about the condition of the plaintiff's knees before the accident, or whether the injuries complained of were entirely a result of the accident or constituted an aggravation of a pre-existing injury. Nonetheless, because the expert testified to a reasonable degree of medical certainty that the accident had been a substantial cause, if not the only cause, of the plaintiff's injuries, we ruled that the trial court should have admitted the testimony. 808 A.2d at 959-61. We read Dr. Breitenstein's testimony as neither less certain nor more qualified or conjectural than the expert's in **Kovach**. Consequently, his testimony certainly provided sufficient support with regard to causation to avoid summary judgment in the instant case.

Dr. Siwek also attacks the sufficiency of Dr. Breitenstein's testimony. However, she does so almost entirely by quibbling with the assertions therein. **See** Brief for Siwek at 15-18. Dr. Siwek's alternative view of the case has no place in a summary judgment proceeding; to the extent that we

_(Footnote Continued Next Page)_

In light of the liberal standard Pennsylvania courts are directed by *Hamil* and its progeny to apply to increased-risk-of-harm cases where direct causation cannot be established, and Appellants' voluminous evidence, stated to a reasonable degree of medical or professional certainty, that Appellees' acts or omissions substantially increased K.H.'s risk of harm, the trial court simply applied too rigid a standard in finding that Appellants' evidence of causation was so speculative as to warrant dismissal. To the contrary, the causation evidence submitted by Appellants for precisely that purpose was a model of the sort of evidence that *Hamil* deemed sufficient to support a *prima facie* case of medical negligence. Consequently, the trial court erred when it found Appellants' causation evidence wanting.[20]

Having found, *supra*, that Appellants' showings also were adequate to establish jury questions regarding all four elements of medical malpractice, we conclude that the trial court erred in entering summary judgment in favor of Appellees.

### D. Appellants' Entitlement to a Jury Instruction Regarding Negligence *Per Se* Is Moot.

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯

deem Dr. Breitenstein's testimony to have been sufficiently certain to reach a jury, we need only consider that testimony, viewing it in the light most favorable to the Appellants.

[20] The trial court's erroneous conclusions follow in part from a question-begging premise. In ruling that K.H. "was not injured as a result of any treatment," the court implicitly assumed that the standard of care entails only clinical treatment, and does not require reporting suspicions of abuse, which we have found involves a fact question to be determined by a jury.

We now turn to Appellants' third issue. Appellants contend that the trial court erred in determining that they are not entitled to a negligence *per se* jury instruction on the grounds that Appellees' violation of the CPSL, without more, would suffice to establish a breach of Appellees' duty for purposes of setting forth claims of medical malpractice, leaving the jury after such a finding to assess only proximate causation and damages. We need not resolve this issue, for two reasons.

First, whether to provide a negligence *per se* instruction is not typically a matter that is disposed of in a motion for summary judgment, insofar as its propriety most often is a matter to be measured against the evidence adduced at trial. Second, the trial court's ruling on this matter was based in part upon premises that we have rejected above. Thus, the court may rule differently in light of our analysis of those premises and the parties' presentations of the evidence at trial. Because this issue was prematurely addressed, and presently is moot, we leave its final disposition for the trial court in the first instance, without prejudice to Appellants' entitlement to raise the issue in a future post-trial appeal, should the trial court again reject their request for such an instruction.

### E. Appellants Have Set Forth a Cognizable Claim for Corporate Negligence Against LGH.

Finally, we consider Appellants' argument that the trial court erred in dismissing their claims against LGH for corporate negligence. The following standard governs:

Corporate negligence is a doctrine under which the hospital is liable if it fails to uphold the proper standard of care owed the patient, which is to ensure the patient's safety and well-being while at the hospital. This theory of liability creates a nondelegable duty which the hospital owes directly to a patient. Therefore, an injured party does not have to rely on and establish the negligence of a third party.

The hospital's duties have been classified into four general areas: (1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment—***Chandler Gen. Hosp. Inc. v. Purvis***, 181 S.E.2d 77 (Ga. Ct. App. 1971); (2) a duty to select and retain only competent physicians—***Johnson v. Misericordia Comm. Hosp.***, 301 N.W.2d 156 (Wis. 1981); (3) a duty to oversee all persons who practice medicine within its walls as to patient care—***Darling v. Charleston Comm. Mem. Hosp.***, 211 N.E.2d 253 (Ill. 1965); and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients—***Wood v. Samaritan Institution, Inc.***, 161 P.2d 556 (Cal. Ct. App. 1945); ***see*** Comment, *The Hospital-Physician Relationship: Hospital Responsibility for Malpractice of Physicians*, 50 Wash.L.Rev. 385 (1975); Note*, Medical Malpractice—Ostensible Agency & Corporate Negligence*, 17 St. Mary's L.J. 551 (1986).

***Thompson v. Nason Hosp.***, 591 A.2d 703, 707 (Pa. 1991) (citations modified; footnote omitted); ***see Scampone v. Highland Park Care Ctr., LLC***, 57 A.3d 582, 597-98 (Pa. 2012).

Appellants' claims hinge upon their claim that LGH failed to have appropriate policies in place for the retention and availability of patients' prior radiological studies and failed to retain adequately qualified physicians to read pediatric radiographs. The trial court rejected these claims for the following reasons:

[Appellants' claim regarding retention of radiographs] falls under the hospital's duty to "adopt and enforce rules and policies to ensure quality care for the patient[." Appellants] have failed to

produce any specific policies or procedures that address LGH's method for storing and organizing patients' past radiological studies. Moreover, neither [Appellants], nor Dr. Oestreich in his report, claim that having had access to [K.H.'s] prior studies would have assisted Dr. Mack and Dr. Smigocki in interpreting the radiographic studies in question. Instead, Dr. Oestreich asserts that the studies would have assisted the radiologists in diagnosing child abuse. Since the [trial c]ourt has already determined that Pennsylvania does not impose a duty upon physicians to report suspected child abuse, even if Drs. Mack and Smigocki had determined that [K.H.] was being abused, they would not have been under a statutory or common[-]law duty to report it.

Finally, [Appellants] assert that, in employing Dr. Mack, LGH "failed to employ a pediatric radiologist [who] was adequately trained, experienced and qualified in reading pediatric radiographs and the recognition of abuse[."] (Oestreich Report, [Appellants'] Exhibit TT [to Omnibus Memorandum].) Specifically, Appellants point to the fact that, in her deposition testimony, Dr. Mack stated that she primarily read breast imaging studies, was the chief of the mammography section, and did not have a special[ty] in reading pediatric radiographs. As demonstrated by her *Curriculum Vitae*, Dr. Mack completed a Pediatric Radiology Fellowship at Children's Medical Center in Dallas, Texas[,] from 1994 to 1995. . . . Additionally, she is Board Certified in Radiology with a "Certificate of Added Qualifications in Pediatric Radiology[."] Given these credentials, there is absolutely no question that Dr. Mack was qualified to read K.H.'s studies.

T.C.O. at 26.

We begin with the trial court's latter rationale. In response to the determination that "there is absolutely no question that Dr. Mack was qualified to read [K.H.'s] studies," Appellant argues that the trial court essentially resolved a material question of fact best left to the jury in accepting Dr. Mack's CV as evidence conclusive of her qualifications despite Dr. Mack's testimony that her principal responsibilities at the relevant time

involved mammography rather than pediatric radiology. The trial court provided no additional support to suggest that this was a determination appropriately resolved by the court rather than by a jury. However strongly Dr. Mack's CV might militate in favor of finding that she was qualified, we find no principled basis not to have allowed the jury to resolve the discrepancy. On summary judgment, as our governing standard makes clear, all doubts are to be resolved in favor of the non-moving party. The trial court's conclusion in this regard is inconsistent with the governing standard. Accordingly, to the extent the trial court's ruling on corporate negligence depended on this finding, we reject it.

With respect to the trial court's first rationale, Appellants aptly note that the trial court expressly relied upon its own finding that no civil remedy for a failure to reporting child abuse would lie under the CPSL or the common law. Insofar as we have rejected the trial court's ruling in this regard, that rationale will not stand.

Appellants further argue that the trial court's determination that they "failed to produce any specific policies or procedures that address LGH's method for storing and organizing patients' past radiological studies" proves, rather than undermines, their claim, insofar as their allegations that LGH was negligent inhered in the **absence** of such policies.

In support of this claim, Appellants cite the following exchange from Dr. Smigocki's deposition testimony:[21]

Q. Is there somebody in your office that you would ask or—

A. Our office? No. It would be a hospital record.

Q. Is there somebody at the hospital that you would ask?

A. The film library.

Q. Is there a person that's currently a custodian or at the film library that you would ask?

A. No.

Q. When you reviewed and interpreted the December 6th, 2002, ultrasound, you had whatever information was written on the order form; correct?

A. I would assume.

Q. Okay. And you also had any previous studies; correct?

A. Possibly.

Q. Why do you say "possibly"?

A. Well, previous studies are not always available.

Q. Okay. And what are the range of reasons why they wouldn't be available?

A. Sometimes they can't be located. Sometimes—

Q. Like, if they're lost?

A. They could be lost. They could be misplaced. They could be in a referring clinician's trunk.

---

[21] This excerpt starts *in medias res*, a product of Appellants' election to attach only excerpts of the deposition transcript to their Omnibus Memorandum. However, there is sufficient context to understand the thrust of Appellants' contentions and the degree to which Dr. Smigocki's testimony supports them.

Q.    If they were lost or misplaced or in a referring clinician's trunk, there would still be a record of the fact that they had existed; correct?

A.    Presumably.

Q.    Okay. So you would have available to you at least a list of what previous studies there were.

A.    Yes.

Q.    And if it turned out that you wanted to review a previous study, but it wasn't in the—it would have been electronic or in the film jacket?

A.    I don't know how it was back in 2002.

Notes of Deposition Testimony—Gene Smigocki, 10/4/2012, at 85-86.

Even if we assume that this testimony, standing alone, provides only limited support for the proposition that LGH did not have an appropriate records policy, one that might have enabled Drs. Mack or Smigocki to conduct a clinically appropriate comparative review of K.H.'s radiographs with former studies, once again it usurps the trial court's function to pass judgment on the weight of this evidence in reviewing a motion for summary judgment. This testimony provides a modicum of support for the proposition that LGH's records policy was either inadequate, or inadequately conveyed to physicians with LGH privileges, such that corporate negligence might lie for a breach of LGH's "duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients." ***See Thompson***, 591 A.2d at 707. In his report, Dr. Oestreich noted that it was "unfortunate that Dr. Mack failed to review the chest x-ray from [K.H.'s] birth. To the extent that it was not made available to her, the hospital/practice group should

have had a practice in place for the prior films to be available for review." Oestreich Report at 8. This, viewed in tandem with Dr. Smigocki's equivocal testimony regarding LGH's policies for retaining prior scans, sufficed to create a genuine issue of material fact, such that it was error for the trial court to grant summary judgment to LGH relative to Appellants' claims for corporate negligence.

## III. Conclusion

In its contemporary form, the Hippocratic Oath sworn by aspiring physicians in the United States provides, *inter alia*, that "I will remember that I do not treat a fever chart, a cancerous growth, but a sick human being, whose illness may affect the person's family and economic stability. My responsibility includes these related problems, if I am to care adequately for the sick." The Oath also provides that "I will prevent disease whenever I can, for prevention is preferable to cure." In its archaic form, the Oath also provided that "I will keep [the sick] from harm and injustice."[22]

These sound sentiments are embodied in the CPSL, it is true, but the potential harm that may befall children when their physicians fail to behave according to professional reporting requirements vastly exceeds the harm inuring to the public. Children, like all individuals, find legal protection, and

---

[22] For all quotations, *see* Bioethics, Johns Hopkins Sheradan Libraries & University Museums, available at guides.library.jhu.edu/c.php?g= 202502&p=1335752 (last reviewed June 26, 2015).

grounds for civil recourse, whenever a physician violates his or her duty of care. That duty of care is determined not by the General Assembly but by the community of physicians. Irrespective of whether the legislature intended to imply a private right of action under the CPSL, it beggars belief that, in enacting that statute, the General Assembly intended to immunize from civil redress violations of the standard of care so severe that the legislature deemed them worthy of criminal punishment. The anomaly is cast into relief even more stark when one considers that civil redress undisputedly remains available for far less egregious violations of that standard of care.

We need not address on this day whether the CPSL itself furnishes such a remedy; Appellants do not argue that it does. Indeed, today we need not decide whether, as Appellants allege, Appellees serially violated the standard of care in passing K.H. amongst themselves while repeatedly setting aside concerns that he was the victim of abuse. Nor need we decide whether, in so doing, Appellees caused the crippling harm that eventually befell K.H. at the hands of his biological father's continuing abuse. Indeed, the essence of our ruling is that it is not our place, nor that of the trial judge, to do so. We need decide only whether the trial court improperly intruded upon Appellants' right to have a jury hear testimony regarding the independent obligations of the standard of care and testimony to the effect that such violations, if any, substantially increased K.H.'s risk of harm over the several months that K.H. presented to the various Appellees, allegedly

with tell-tale signs of continuing abuse the nature of which was readily detectable by those physicians. The trial court did precisely that, in violation of the governing standard.

Specifically, the trial court improperly ruled that Appellants failed to present a *prima facie* case of medical malpractice against all six named Appellees who undertook K.H.'s care from September to December of 2002. This includes both Appellants' claims of malpractice predicated on the failures to report suspicions of abuse as well as their claims against Dr. Mack and Dr. Smigocki, and the vicarious liability of Lancaster Radiology and LGH, for malpractice associated with their review of K.H.'s radiographs.[23] We also find that Appellants have set forth a *prima facie* case of corporate negligence against LGH. Finally, we find that any decision regarding the propriety of a negligence *per se* instruction would be premature and advisory, insofar as our other disposition and analyses of related issues render the matter moot at this time.

For the foregoing reasons, we reverse in all aspects the trial court's entry of summary judgment for Appellees and its dismissal with prejudice of

---

[23] Because the trial court's dismissal of these claims was based upon its finding that Appellants could not seek damages for the failure to report that Appellants allege was, in part, a consequence of Drs. Mack and Smigocki's malpractice in this regard, our ruling that such claims **will** lie renders the trial court's disposition of these claims erroneous.

Appellants' amended complaint, and we remand for further proceedings consistent with this opinion.

Judgment reversed. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/25/2015